## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**KYRON LA-TRELL WILLIAMS,**
**a minor,** *et al.*                                                    **PLAINTIFFS**

**vs.**                                      **CIVIL ACTION No.: 3:15-CV-103-HTW-LRA**

**CITY OF YAZOO, MISSISSIPPI,** *et al*.                    **DEFENDANTS**

### ORDER GRANTING IN PART AND DENYING IN PART
### MOTION FOR SUMMARY JUDGMENT

At approximately 1:45 a.m., on May 19, 2014, Marshawn Williams (hereinafter referred to as "Williams") an African-American male of 24 years of age, died while being incarcerated in the Yazoo City Detention Center, located in Yazoo City, Mississippi. His legal heirs contend that his last breaths were in agony while he and cellmates frantically endeavored to convince the jailors to summon him some medical attention for his death-threatening ailment.

This lawsuit represents the story of that fatal drama and the events which framed its backdrop. The storytellers are predictable: one version of woe and police neglect told by the heirs and their supporters; the other version of police exculpability supplied by the Yazoo City police.

Overlapping both versions are various undisputed facts. Williams and his live-in girlfriend had a verbal argument turned physical with each party striking the other; with the girlfriend's brother striking Williams with a pipe or bedrail; while Williams had a blood clotting disorder, which was aggravated, leading to Williams' death in the midst of Yazoo Police Officers who failed or refused to provide Williams, in spite of his alleged pleas for such, any medical care which could have saved his life.

1

The parties have submitted thirteen (13) depositions and a potpourri of documents in their respective campaigns for victory – the plaintiffs seeking monetary damages; the defendants in search of vindication.

Overarching whatever the ultimate facts eventually will reveal is the law of this litigation, the clarifying onus placed upon the judge to announce in this hearing directed not at a determination of the merits of this debate, but at a determination whether this lawsuit owns the factual and legal muscle to power a trial and, if so, what claims and which defendants are to remain after this inquiry.

The juridical procedural approach which captures our attention is the defendants' Motion for Summary Judgment **[Docket no. 98]**. Over the lengthy course of this litigation, this court has met often with the parties, to hear argument and to narrow the issues.[1] Those days are now past and with both sides entrenched in their stated positions, this court must end the logjam and announce its decision.

## I.      THE PARTICIPANTS

The plaintiffs herein are: Kyron La-Trell Williams, a minor, by and through his mother and natural guardian, Lavina Smith (hereinafter referred to as "Lavina"); Lavina in her individual capacity[2]; Lavina on behalf of all wrongful death beneficiaries of Marshawn Williams; and Donnie Williams (hereinafter referred to as "Donnie"), Williams' mother.

---

[1] Although the parties did not specifically raise the issue of the absence of Calvin Smith as a party in this litigation, this court asked for briefings from the parties whether Calvin Smith was a necessary party and whether, at trial, the defense would argue the "empty chair" defense if the plaintiffs did not add Calvin Smith as a defendant, because Calvin Smith allegedly struck the blow to Williams which supposedly resulted in his death.

[2] It is unclear from the face of plaintiffs' Third Amended Complaint how Lavina Smith is a plaintiff in her individual capacity. Lavina is listed in the case caption in her individual capacity and on behalf of her minor child that Williams fathered with her. This court can find no other location in the plaintiffs' Third Amended Complaint wherein Lavina is listed in her individual capacity.

The defendants herein are: the City of Yazoo, Mississippi; the Yazoo City Police Department; Andre Lloyd; Patrick Jaco; Chris Dean; Clifton Tilmon[3]; Arthur Thompson; Kenyon Banks; Tracey Langston; Artis Harris and various unknown officers and shift supervisors. The City of Yazoo and the Yazoo City Police Department will be referred to in this memorandum opinion as "the City defendants". The individual officers and jailers will be referred to under their individual names or as the "individual defendants".

The intervenor-plaintiffs herein are: the Estate of Marshawn Williams; and Za-Riya Williams.

The principal non-party fact actors who may be called as witnesses are: Lavina's brother, Calvin Smith, who allegedly struck Williams with the metal object; Lavina's cousin, Brittany Smith; Lavina's step-uncle, who name is unknown to this court; Robert Cheatham, who was Williams' cellmate on the night of Williams' death; Desi Parker and Earnest Diew, who were inmates at the Yazoo City Detention Center, but in different cells than Williams and Parker.

## II.    THE CAUSES OF ACTION

The plaintiffs filed their complaint in this federal forum on February 17, 2015 alleging federal causes of action for: false arrest in violation of Title 42 U.S.C. § 1983; excessive force in violation of Title 42 U.S.C. § 1983; denial of medical care in violation of Title 42 U.S.C. § 1983; failure to train or supervise; practice or custom of denying emergency medical treatment in violation of the Eighth and Fourteenth Amendments of the United States Constitution; and under state law the claims of assault; battery; intentional infliction of emotional distress; negligence; negligent infliction of emotional distress; negligent infliction of emotional distress (bystander recovery); and intentional infliction of emotional distress (bystander recovery). [Docket no. 1].

---

[3] Originally the plaintiffs named Clifton Tilmon, Andre Lloyd, and various unknown officers and shift supervisors. During the litigation the plaintiffs dismissed Tilmon and Lloyd from the lawsuit and this court has ignored the various unknown officers and shift supervisors for failure of the plaintiffs to specifically identify.

### III.   SUBJECT MATTER JURISDICTION

The plaintiffs say this court possesses "federal question" subject matter jurisdiction under the authority of Title 28 U.S.C. § 1331[4]. The defendants have not challenged subject matter federal question jurisdiction; nevertheless, this court has an independent obligation to verify it possesses appropriate subject matter jurisdiction.[5]

Since the plaintiffs have asserted various causes of action invoking the authority of Title 42 U.S.C. § 1983[6], a federal enactment, this court finds that it indeed possesses federal question subject matter jurisdiction over the federal claims under the authority of Title 28 U.S.C. § 1331. *See Moor v. Alameda Cty.*, 411 U.S. 693, 712, 93 S. Ct. 1785, 1797, 36 L. Ed. 2d 596 (1973) ("there is no question that petitioners' complaints stated substantial federal causes of action against the individual defendants under 42 U.S.C. § 1983.") (Citing *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

---

[4] The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C.A. § 1331 (West)

[5] Federal courts are obliged to examine the basis for the exercise of federal subject-matter jurisdiction. *Smith v. Texas Children's Hospital*, 172 F.3d 923, 925 (5th Cir. 1999). A federal district court may examine its subject-matter jurisdiction over a matter, *sua sponte*, at any time. *Giles v. Nylcare Health Plans, Inc.*, 172 F.3d 332, 336 (5th Cir. 1999) (a court must raise the issue *sua sponte* if it discovers that it lacks subject matter jurisdiction); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2007). Under Rule 12(h)(3) of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added).

*Dean v. Mozingo*, 521 F. Supp. 2d 541, 551 (S.D. Miss. 2007)(overturned on other grounds).

[6] Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.A. § 1983 (West)

This court also finds that it possesses supplemental jurisdiction over the state law claims under the authority of Title 28 U.S.C. § 1367[7]. Supplemental jurisdiction adorns a lawsuit where the parties have asserted causes of action over which this court possesses subject matter "federal question" jurisdiction simultaneously with purely state law causes of action, over which this court would not normally possess subject matter jurisdiction.

## IV.    PROCEDURAL HISTORY

Plaintiffs filed their original complaint in this federal forum on February 17, 2015. Plaintiffs, before serving any defendants, filed their First and Second Amended Complaints on the same date, June 11, 2015. [Docket nos. 2 and 3]. This court is unaware why plaintiffs filed two amended complaints on the same date; however, the Second Amended Complaint named Sharon Vancleve as an additional defendant while the First Amended Complaint did not.

The defendants filed their collective answer on August 17, 2015. [Docket no. 18].

After the plaintiffs and defendants had conducted significant discovery, a group of two (2) intervenor plaintiffs filed their Motion to Intervene on May 23, 2016. [Docket no. 77]. That motion listed Keiara Wiley as the Administratrix of the Estate of Williams and as the natural mother and guardian of Za'Riya Williams, Williams' natural daughter. United States Magistrate Judge Linda R. Anderson granted the Motion to Intervene on June 20, 2016.

The plaintiffs filed their Third Amended Complaint on November 15, 2016, identifying additional defendants, namely: Kenyon Banks, Tracey Langston, and Artis Harris. [Docket no. 93]. The plaintiffs' Third Amended Complaint is the currently operative complaint.

---

[7] (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C.A. § 1367 (West).

The defendants filed, on January 27, 2017, their Motion for Summary Judgment, **[Docket no. 98]** along with their memorandum brief in support of their motion. [Docket no. 99]. The plaintiffs filed their response in opposition [Docket no. 106] and their supporting memorandum brief [Docket no. 107] on March 6, 2017. The defendants replied on March 22, 2017, by filing their reply [Docket no. 110] and memorandum brief [Docket no. 111].

This court subsequently held multiple motion hearings whereat the parties presented oral arguments: June 2, 2017; July 21, 2017; February 23, 2018; December 18, 2018; February 5, 2019; and April 23, 2019. The court inquired as to various issues of fact and law and required the parties to present additional authority and evidence.

This court also held settlement conferences on at least two (2) separate occasions, during which time the parties were unsuccessful in their settlement negotiations.

## V.    FACTUAL BASIS

On May 18, 2014, Williams and Lavina, then involved in a romantic relationship, were co-habitating a residence at 221 North Ward Street, Yazoo City, Mississippi. During the course of the evening, Williams imbibed an unknown amount of an alcoholic beverage[8], believed to be beer. At some point, Lavina aired her suspicion that Williams had been engaging in sexual relations with a female co-worker of his. This accusation precipitated a verbal argument between the two, which soon degenerated into acts of violence. Williams and Lavina struck each other with a hand or fist. Lavina then tried to run away. Lavina claims that Williams had a history of striking her, as, she claims, he had done so before at least five (5) times.

Lavina's cousin, Brittany Smith (hereinafter referred to as "Brittany"), was also present at the house at the time and she joined in the dispute, seeking, she says, to prevent Williams from

---

[8] The parties are in agreement that they do not know how much beer Williams had consumed that fateful night; however, they are in agreement that he had drunk beer. Williams' autopsy shows that his blood alcohol content after death was 0.103, an amount that is over the legal limit for intoxication - 0.08 or greater BAC.

striking Lavina again. During the course of her intervention, Brittany called the Yazoo City Police Department (hereinafter referred to as "YCPD") to report the domestic dispute. After talking with the YCPD, Brittany then called Lavina's mother, brother, and step-uncle. After Williams and Lavina ceased their altercation, each went to different locations within the house. Williams thereafter allegedly telephoned his mother, Donnie Williams (hereinafter referred to as "Donnie").

Roughly five (5) to ten (10) minutes later, Lavina's mother, brother, and step-uncle arrived at the house in response to Brittany's telephone call. Lavina's mother entered the home and confronted Williams about his having assaulted her daughter. Lavina's brother, Calvin Smith (hereinafter referred to as "Calvin"), entered the house moments later. Supposedly, enraged over Williams' physicality towards his sister, Calvin ran through the house holding some metal object and thereafter hit Williams in the side[9] with that metal object[10]. Lavina testified at her deposition that the object was a bedrail. Defending himself, Williams grabbed the object (he supposedly told Officer Dean the object was a "pipe"), and began to struggle with Calvin for possession of the metal object. Lavina's step-uncle then stepped between the two combatants to stop the struggle. An angry Williams then commanded everyone to "get out of [his] house."

Meanwhile, YCPD dispatch sent several YCPD police officers to the residence in response to Brittany's telephone call to YCPD: Sergeant Arthur Thompson (hereinafter referred to as "Sgt. Thompson"); Lieutenant Artis Harris (hereinafter referred to as "Lt. Harris"); Officer Chris Dean (hereinafter referred to as "Officer Dean"); and Officer Kenyon Banks (hereinafter referred to as "Officer Banks").

---

[9] Lavina testified she saw Williams get struck but, did not know if Calvin struck Williams on the left or right side of his body.

[10] Lavina testified Williams was struck with a bedrail. Officer Dean, on the other hand, testified that Williams told him that Williams had been struck with a metal pipe.

Lt. Harris and Officer Dean arrived first at the residence. When they arrived, they split up and began their investigation. Both Officer Dean and Lt. Harris immediately observed a number of beer cans on the front porch. Some of the beer cans were open. They also saw a male and female subject – later identified as Calvin and Brittany.

Lt. Harris entered the residence. Therein he talked with Lavina. Lavina told Lt. Harris that Williams had assaulted her. Lt. Harris saw evidence of such; he noticed that Lavina's shirt had been ripped and that she had scratches on her upper chest. Lavina informed Lt. Harris that she wanted to press charges for domestic violence against Williams. Upon receiving this information, Lt. Harris exited the residence to discuss the incident with Williams.

Officer Dean had stayed outside the residence to conduct his investigation. While outside, Officer Dean questioned Calvin about the earlier house activities. During his discussion with Calvin, Officer Dean observed a second male who was inside the home "trying to keep in the shadow." [Docket no. 98-4, P. 15, L. 1]. Officer Dean asked that male to come outside so that they could talk.

The shadowed male exited the residence and identified himself as Williams. Officer Dean asked Williams what had occurred at the residence. Williams admitted he and Lavina had been in a physical altercation.

He also reported that someone had struck him in the side with a pipe. Officer Dean inspected Williams and observed only small scratches as if "from like a female clawing at him." [Docket no. 98-4, P. 15, L. 13]. Allegedly, Officer Dean observed no deep bruising, nor any broken bones. Towards the end of the conversation, between Officer Dean and Williams, Williams, said Officer Dean, laid on the porch, "like he was trying to go to sleep." [Docket no. 98-4, P.15, L. 21-22].

As above stated, after Lt. Harris had finished interviewing Lavina, he then exited the residence. Outside he spoke with Williams, who admitted to the officers that he had been drinking that evening. Williams, the officers testified, appeared to be intoxicated. Williams exhibited slurred speech; glazed eyes; impaired motor skills; and about him was the strong smell of alcohol. Lt. Harris then informed Williams that he was under arrest for domestic violence. Officer Dean placed handcuffs on Williams after Williams stood up.

During the time that Lt. Harris and Officer Dean were talking with Lavina and Williams, Officer Kenyon Banks (hereinafter referred to as "Officer Banks") and Sergeant Arthur Thompson (hereinafter referred to as "Sgt. Thompson") arrived at the residence. Sgt. Thompson entered the residence to assist Lt. Harris. Officer Banks stayed outside with Officer Dean. While inside with Lavina and Lt. Harris, Sgt. Thompson alleges that Officer Banks entered the residence and asked Sgt. Thompson for his pepper spray (also known as "mace" or "OC spray"). Sgt. Thompson gave his pepper spray to Officer Banks, who, in turn, apparently gave the pepper spray to Lt. Harris.

After this point, the accounts by the principals differs significantly in several respects. Most of the law enforcement officers agree that Officer Dean and Officer Banks transported Williams to the YCPD Jail (although Lt. Harris testified he and Officer Dean were the two officers who transported Williams to the YCPD Jail), which was less than a five (5) minutes' drive from the residence. They also mostly agree that Williams was passively resisting Officer Dean's and Officer Banks' attempts to place Williams in the back of the police cruiser at the Williams residence. According to all the law enforcement officers, with the exception of Sgt. Thompson, when they approached the vehicle, Williams allegedly began this pattern of "passive resistance" by forcing the escorting officers to carry him to the vehicle. Sgt. Thompson testified

in his deposition that he did not remember whether Williams was resisting or had OC (mace/pepper) spray applied. Lavina, who had left the inside of the residence and was standing on the front porch, alleges that Williams could not walk and appeared to be incapacitated.

After ordering Williams to stop resisting, to stand up, and walk to the vehicle, commands which Williams allegedly refused, Lt. Harris sprayed Williams in the face with OC spray (also known as "pepper spray" or "mace")[11] to "gain compliance." After being sprayed by Lt. Harris with OC Spray, Williams allegedly stood up and got into the police cruiser.

All law enforcement officers agree that Williams never told them that he needed medical treatment. None of the law enforcement officers testified that Williams asked for his medication, and all agree that Williams did not inform them about what his medical diagnosis was.

Officers Dean and Banks then drove the police cruiser to the YCPD Station, the location of the Yazoo City Jail. When they arrived at the jail, Williams allegedly became passively resistant again. According to Officer Banks, he and Officer Dean had to extract Williams from the police cruiser by force because Williams was hooking his feet under the seats and resisting the officers' attempt to extract him from the vehicle. Officer Banks and Officer Dean then escorted Williams inside the jail to the booking area for processing into the jail. None of the officers completed a medical assessment or screening of Williams.

---

[11] Pepper spray (also known as capsicum spray) is a lachrymatory agent (a chemical compound that irritates the eyes to cause tears, pain, and temporary blindness) used in policing, riot control, crowd control, and self-defense, including defense against dogs and bears. Its inflammatory effects cause the eyes to close, taking away vision. This temporary blindness allows officers to more easily restrain subjects and permits people using pepper spray for self-defense an opportunity to escape. Although considered a less-than-lethal agent, it has been deadly in rare cases, and concerns have been raised about a number of deaths where [pepper spray had been deployed].

[Pepper spray is also known as OC Spray because the] active ingredient in pepper spray is capsaicin, which is a chemical derived from the fruit of plants in the Capsicum genus, including chilis. Extraction of oleoresin capsicum (OC) from peppers requires capsicum to be finely ground, from which capsaicin is then extracted using an organic solvent such as ethanol. The solvent is then evaporated, and the remaining waxlike resin is the oleoresin capsicum. https://www.medicalnewstoday.com/articles/238262.php

Lavina arrived at the jail about the same time as the arrested Williams and the officers. She came to complete the paperwork necessary to press charges against Williams for "domestic violence – simple assault". Lt. Harris, who was the senior officer, went to assist Lavina with the paperwork. When Lavina was finished with the paperwork, she went back to her home.

Upon her arrival at home, Lavina found that her family members were congregated inside her home. Williams' family, however, was outside the home where they were vigorously discussing what had happened between Williams and Lavina. During that conversation, Lavina's brother, Calvin, allegedly told Donnie Williams (hereinafter referred to as "Donnie"), Williams' mother, that Williams earlier had grabbed his side and fallen over. Donnie then confronted Lavina, asking why she, too, had not been arrested with Williams.

While the two were talking, Officer Patrick Jaco (hereinafter referred to as "Officer Jaco") telephoned Lavina and asked if Williams was on any medication. Lavina replied that she did not know. She then handed the phone to Donnie, who told Officer Jaco she would discuss the matter in a few minutes when she arrived at the jail.

Sgt. Thompson, who completed the booking paperwork on Williams, contends that Williams again exhibited passive resistant behavior by not providing his name, nor any personal information. Officer Jaco was off duty at the time but he was present at the jail to drop off some paperwork. He says he observed Williams being booked and, further, he confirmed Sgt. Thompson's testimony. Williams appeared, according to the officers present, to be intoxicated: he smelled of intoxicating beverages; he slurred his speech; he staggered when he walked; and he urinated on himself while sitting in a chair in the booking area. Williams also allegedly "slumped out of the chair" to the ground and had to be assisted back into the chair.

YCPD Jail policy requires that the jailor or booking officer must complete all necessary records, including a medical screening form, whether or not the arrestee will be placed in a housing unit or released on bond. That same policy also requires that the booking officer ensures that a visibly intoxicated inmate be placed in a holding cell and visually supervised. In the event that the booking officer determines that the arrestee is visibly injured, that officer must seek medical attention for that inmate before he/she is placed in a holding cell. Unfortunately, all of the officers testified that they did not know about the YCPD policies. When asked about their knowledge of these policies, the officers testified as follows:

<u>Lt. Harris</u>

Q.     Do you know what a medical screening form is?

A.     No, sir. Could you enlighten me?

Q.     […] This is [… Yazoo City's] policy regarding admitting inmates to jail. And it says "the jailer or booking officer will make certain that the necessary records are complete." And on of the four bulleted records there is a medical screening form. And it says "the booking officer/jailer will complete the medical screening form." Do you see that?

A.     Yes, sir.

Q.     Okay. You don't know what a medical screening form is?

A.     I guess not, no, sir.

[Docket no. 106-2, P. 12-13].

<u>Officer Dean</u>

Q.     When you are booking inmates at Yazoo City Police Department, do you complete a medical screening form in the booking process?

A.     I don't recall every having to complete one.

Q.     Do you recall ever seeing one?

A.     No, sir.

[Docket no. 106-3, P. 12].

12

<u>Officer Banks</u>

Q.     Okay. In booking officers, as – in booking an inmate at the Yazoo City Police Department, do you complete a medical screening form during the booking process?

A.     Explain.

Q.     A form in which you fill out related to the medical status of an inmate who is being booked into jail?

A.     Nope.

[Docket no. 106-5, P. 20].

<u>Chief Lloyd</u>

Q.     Okay. And I may have asked you this a minute ago, but did the Yazoo City Police Department have a document called a Medical Screening Form that they filled out for inmates being admitted to jail?

A.     Not to my knowledge.

[Docket no. 106-22, P. 7].

After Sgt. Thompson was finished processing Williams' booking paperwork, two (2) officers escorted Williams down the hall to cell 4. The police say the two were Officers Banks and Dean. Inmates Diew and Parker say that one of the officers was Officer Jaco without identifying the other officer.

To access the Yazoo City Jail, one has to travel down a hallway in the back of the Yazoo City Police Department Station. The jailer's station is a room just outside the hallway where the cells are. The hallway contains six (6) rooms which are denominated for the five (5) holding cells and one (1) changing room. The rooms are numbered one (1) through six (6). Cell six (6) is closest to the entrance to the hallway and, consequently, the jailer's station. According to Jailer Tracey Langston, intercoms were not present anywhere in the jail at the time Williams was arrested.

13

Three (3) adult males were inmates in the Yazoo City Jail on the night of Williams' arrest: Robert Phillip Cheatham (hereinafter referred to as "Cheatham"); Desi Parker (hereinafter referred to as "Parker"); and Earnest Diew (hereinafter referred to as "Diew"). All three (3) inmates have provided the following depositional testimony: the two (2) officers who escorted Williams to cell 4 had to support him between themselves; Williams' feet were dragging on the ground; Williams asked for his medicine; the jail cells contained intercoms to talk with the jailer; the inmates yelled to Jailer Langston on the intercoms in the cells to get her attention; the inmates banged on their doors for two (2) to three (3) hours to get Jailer Langston's attention; and Jailer Langston told the inmates to quiet down and that she could not do anything until the lieutenant arrived at the jail. Cheatham, who was Williams' cellmate, testified that the two (2) police officers asked if Cheatham wanted company before the officers has thrown Williams into the cell with Cheatham. Inmates Diew and Parker both testified that Officer Jaco or "Jacob" was one of the two (2) escorting officers, but they did not know the other officer.

The individual officer defendants have a different version of these events. The two officers – Officer Dean and Officer Banks, whom Diew, Parker and Cheatham never identified – deny having thrown Williams into the cell. They testified that they would not have done that because Williams was having trouble walking and they (the officers) did not want to injure him. Jailer Langston testified that the jail did not have intercoms for the inmates to talk with her and that she did not refuse medical care to Williams because she was not aware he needed it. According to Jailer Langston, Lt. Harris told her that Williams was drunk, and said nothing about Williams being injured or needing medical care.

While two (2) officers were assisting Williams to his cell, Donnie arrived at the Yazoo City Jail to attempt to secure Willams' release. When Donnie arrived at the jail, she sought out

the Watch Supervisor, Lt. Harris. Allegedly, multiple officers were present when Donnie spoke with Lt. Harris. Donnie identified Officer Dean, Officer Jaco, Lt. Harris, Officer VanCleve, and Officer Banks. Donnie asked Lt. Harris two (2) questions: why had they not also arrested Lavina; and could she obtain Williams' release. Lt. Harris told Donnie that he could not release Williams until Williams had been before a judge to obtain a bond.

Donnie next allegedly informed the officers present that "[Williams] had a condition with his platelets being low and if he got hurt [physically] in any kind of way, that his blood wouldn't clot, that his blood would just bleed (*sic*), he would just bleed." [Docket no. 106-9, P. 11]. Williams' sister, allegedly corroborated Donnie's statement. She added, "he could die." *Id*. Officer Banks, according to Donnie, then commented that Williams had passed out in the patrol car while Officer Dean was transporting Williams to the jail. Donnie also allegedly told the officers – according to Lt. Harris, Officer VanCleve, and Officer Banks – that Williams had medicine, but that he didn't take it like he should. Donnie, on the other hand, testified that Williams had stopped taking any medication and, thus, did not take any medicine at the time.

Lt. Harris then allegedly took Donnie to the booking area in the jail to show her the chair in which Williams had been sitting when he had urinated on himself. Donnie then left the jail; she had not been able to see or talk with Williams.

Lt. Harris and Officer Dean next left the jail to respond to another call about an unresponsive male sitting in his vehicle. After some time, around 2:15 a.m., Lt. Harris received a telephone call on his cellular telephone from an unknown officer. That unknown officer, later identified as Officer Banks, informed Lt. Harris that Williams had been found unresponsive in his cell. Lt. Harris immediately went back to the jail to check on Williams. Officer Dean

accompanied Lt. Harris. Once at the jail, in Williams' cell, upon examining Williams, neither officer could find Williams' pulse. Lt. Harris called the ambulance and his supervisors.

The autopsy report indicates that Williams, a 24 year-old, with a past medical history of hepatic cirrhosis[12] and pancytopenia[13], died of natural causes related to "complications of hepatic cirrhosis." The medical examiner also noted that: "the anterior torso shows superficial blunt force injuries on the left side of the chest and on the left side of the back. No palpable rib fractures are identified." [Docket no. 98-10]. The toxicology report shows that Williams' ethanol result was 103 mg/dl and his B.A.C.[14] was 0.103. [Docket no. 98-11]. The legal level of B.A.C. in Mississippi is .08%.[15] The References Comments of the Autopsy Report explains:

> Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. Ethanol can also be a product of decomposition or degradation of biological samples. The blood alcohol concentrations (BAC) can be expressed as a whole number with the units of mg/dL or as a decimal number with units of g/100 mL which is equivalent to % w/v. For example, a BAC of 85 mg/dL equals 0.085 g/100 mL or 0.085% w/v of ethanol.

[Docket no. 98-11].

---

[12] Hepatic cirrhosis is a chronic degenerative disease in which normal liver cells are damaged and are then replaced by scar tissue.

[13] Pancytopenia is a medical condition in which there is a reduction in the number of red and white blood cells, as well as platelets.

[14] Blood/Breath Alcohol Concentration (BAC) is the amount of alcohol in the bloodstream or on one's breath. BAC is expressed as the weight of ethanol, in grams, in 100 milliliters of blood, or 210 liters of breath. BAC can be measured by breath, blood, or urine tests.

[15] (1) It is unlawful for a person to drive or otherwise operate a vehicle within this state if the person:
    (d) Has an alcohol concentration in the person's blood, based upon grams of alcohol per one hundred (100) milliliters of blood, or grams of alcohol per two hundred ten (210) liters of breath, as shown by a chemical analysis of the person's breath, blood or urine administered as authorized by this chapter, of:
        (i) Eight one-hundredths percent (.08%) or more for a person who is above the legal age to purchase alcoholic beverages under state law;
        (ii) Two one-hundredths percent (.02%) or more for a person who is below the legal age to purchase alcoholic beverages under state law; or
        (iii) Four one-hundredths percent (.04%) or more for a person operating a commercial motor vehicle.
Miss. Code. Ann. § 63-11-30 (West)

Plaintiffs submit that this autopsy report is circumstantial evidence that, standing alone, proves that Williams died as a result of his liver injury. Plaintiffs have informed this court during oral argument that they intend to present a live expert medical doctor who will confirm and expand upon the circumstantial evidence adduced by the autopsy report.

## VI.    SUMMARY JUDGMENT STANDARD

The defendants here seek a grant of summary judgment against the plaintiffs herein. Defendants' quest aims at a judgment from the court instead of a jury, because, say defendants, the essential facts, the material facts, when viewed under the glare of the law, proclaim that a jury is unnecessary to rule on certain issues herein that are too clear and supported by the equally clear law in favor of the defendants.

The jurisprudence of summary judgment, with its built-in protections for the non-movants, here the plaintiffs, must be scrupulously observed. Afterall, when the court grants summary judgment, the court becomes judge and jury and denies the non-movant's day before a jury on the issues determined by the court.

Any analysis whether summary judgment is appropriate must begin with Rule 56, Federal Rule of Civil Procedure:

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion. […]
>
> (c) Procedures.
>
> > (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> >
> > > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. […]

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it; or

(4) issue any other appropriate order. […]

Fed. R. Civ. P. 56.

The "movant" above-mentioned, that is, the filing party for summary judgment, can be a plaintiff or a defendant. If a plaintiff, the endeavor is authorized by Rule 56(a); if a defendant, as here, the thrust is also allowed by Rule 56(a). Regardless, whether the movant is a plaintiff or a defendant, the ensuing procedure is the same.

The movant, to win, must be armed with both a factual and legal mandate. Both are essential; and, in the opening round of debate, both initially must be presented by the movant.

Pursuant to the Rule, the movant first has to address the facts and seek to persuade the court that all of the "material" facts are undisputed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When searching for the material facts, the court and parties look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine if there are no genuine disputes as to any material facts and the moving party is entitled to a judgment as a matter of law. *McDonald v. Entergy Operations Inc*., 2005 WL 2474701, at *3 (S.D. Miss. Apr. 29, 2005) (*quoting* Fed. R. Civ. P. 56(c)).

A fact is "material" where "its resolution could affect the outcome of the action". *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co*., 706 F.3d 622, 628 (5th Cir. 2013).

The movant has the burden to identify evidence, or the lack thereof, showing an absence of genuine dispute. *See Bell v. Dallas County, Texas*, 432 Fed.App's 330, 332 (5th Cir. 2011). Predictably, the movant seeks to show an absence, while the non-movant takes an opposite view.

Following the court's collection of all the material facts, the court will then be in position to conclude whether the parties actually have a dispute over the genuine issues of material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-257 (1986).

During this process, both parties with their briefs, or allowed oral arguments, will have an opportunity to champion their respective positions. The briefing schedule is governed by the local rules of court. L.U.Civ.R. 7(b)(2)(D)[16]

---

[16] (b) Motion Practice. Any written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule.

(2) Filing, Deadlines, Proposed Orders. Any motion, response, rebuttal and supporting exhibits, including memorandum briefs in support, must be filed. All affidavits, 28 U.S.C. § 1746 declarations, and other supporting documents and exhibits, excluding the memorandum brief, must be filed as exhibits to the motion, response or rebuttal to which they relate. The memorandum brief must be filed as a separate docket item from the motion or response and the exhibits. All supporting exhibits must be denominated in the court's electronic filing system by both an exhibit letter or number and a meaningful description. Further, all supporting exhibits not already of record and cited in the motion, response or rebuttal by docket entry,

Throughout this process, the judge must operate under certain forbearances. First, the court has to place and keep the persuasive burden on the shoulders of the movant, although the productive burden of presenting evidence may shift. *Liberty Lobby, Inc.*, 477 U.S. at 255-257. The court must apply the applicable rules of evidence to the submissions of the parties. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). The court cannot morph conclusory allegations, speculation, unsubstantiated assertions and simply legalistic arguments into "genuine disputes of material facts". *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997). The final finder of fact, whether that be a jury during a jury trial or the judge during a bench trial, is to assess the probative value of the evidence. *International Shortstop, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). The likelihood or unlikelihood of success are also outside of the court's consideration. *McDonald*, 2005 WL 2474701, at *3 (*citing National Screen Serv. Corp. v. Poster Exchange, Inc*., 305 F.2d 647, 651 (5th Cir. 1962)). The court must view the facts, evidence, and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Rogers v. Bromac Title Servs., L.L.C*., 755 F.3d 347, 350 (5th Cir. 2014).

---

must normally be filed under the same docket entry and denominated separately in the court's electronic filing system as exhibits to the motion, response or rebuttal to which they relate, unless doing so is not practicable, in which case supporting exhibits may be filed as separate docket item attachments, associated by the docket number of the motion, response or rebuttal to which they relate. Counsel must file a memorandum brief as a separate docket item from the motion or response to which it relates and must not make the memorandum brief an exhibit to a motion or response, except in the case of a motion for leave to submit the referenced memorandum brief. If leave of court is required under Fed.R. Civ.P. 15, a proposed amended pleading must be an exhibit to a motion for leave to file the pleading, and, if the motion is granted, the movant must file the amended pleading as a separately docketed item within seven (7) days from entry of the order granting the motion. […]

> (D) Unless otherwise ordered by the Case Management Order, all case dispositive motions and motions challenging an opposing party's expert must be filed no later than fourteen calendar days after the discovery deadline.

L.U.Civ.R. 7.

Next, we come to the required legal analysis for summary judgment. The parties submit their juridical perspectives; the court decides. Where a court looks for law is generally decided by the subject-matter jurisdictional grant: if such is diversity of citizenship under Title 28 U.S.C. § 1332[17], the court applies the substantive law of the forum state: *see Learmonth v. Sears, Roebuck & Co.* 710 F.3d 249, 258 (5th Cir. 2013); if the subject-matter jurisdiction arises under federal law, Title 28 U.S.C. § 1331[18], the court looks to federal law. *See Fisk Electric Company v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018).

If after a copious examination of all the applicable material facts, the court finds disputed issues of material facts, the court sends the litigation to the jury. On the other hand, where the court determines that the litigation features an absence of genuine disputes of material facts and the applicable law favors the movant, or where the genuine material facts under the applicable law favor the movant, the court will grant summary judgment to the movant. *Foster v. Globe Life and Accident Ins. Co.*, 980 F.2d 1445 (5th Cir. 1992).

## VII.   STANDARD OF REVIEW

The parties do not dispute the question of whether this lawsuit presents an "episodic act or omission" or a "condition of confinement". The distinction between the two is significant

---

[17] (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

  (1) citizens of different States;

  (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

  (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

  (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C.A. § 1332 (West)

[18] The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C.A. § 1331 (West)

because the standard of review that this court – and the jury – must utilize when applying the facts to the law in this case is different. Accordingly, this court will discuss the two standards and confirm whether the episodic act or omission standard is appropriate to apply in this lawsuit.

a.   *Episodic Act or Omission*

"In an 'episodic act or omission' claim, an official is usually interposed between the prisoner and the governmental entity, such that the prisoner first complains of a particular act or omission of the official and secondarily points to a policy, custom, or procedure that caused or allowed the act or omission." *Graham v. Hodge*, 69 F.Supp. 3d 618, 627 (S.D. Miss. 2014), aff'd, 619 F.App'x 394 (5th Cir. 2015). Under the episodic act or omission analysis, "the standard for determining a violation is one of 'subjective deliberate indifference', where a 'state jail official's liability … cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Id*. Deliberate indifference means that (1) officials were "aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official[s] actually drew that inference; and (3) the official[s'] response indicates the official[s] subjectively intended that harm occur." *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001) (emphasis added).

> "Deliberate indifference is more than mere negligence." The plaintiff must show that "in light of the duties assigned to specific officers or employees the need for more or different training [or supervision was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need" for more training or supervision. "[A] showing of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights."

*Clyce v. Hunt Cty., Tex*., 515 F. App'x 319, 324 (5th Cir. 2013) (Citations Omitted).

The United States Fifth Circuit Court of Appeals, however, adds: "Plaintiffs' evidence, when viewed in the light most favorable to them, creates several disputes of material fact about whether the jail has a de facto policy of inadequately monitoring detainees." *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 793 (5th Cir. 2020).

In the context of denial of medical care, the United State Fifth Circuit Court of Appeals held that:

> *Gobert* further provided examples of what actions do not constitute deliberate indifference, i.e., "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice ... [or] a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* Moreover, *Gobert* concluded that "[a] showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.*

*Graham v. Hodge*, 619 F. App'x 394, 396 (5th Cir. 2015) (Quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

### b.  Condition of Confinement

A condition of confinement is defined as "general conditions, practices, rules [and] restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F. 3d 633, 645 (5th Cir. 1996). The condition "is usually the manifestation of an explicit policy or restriction." *Hawkins* (*citing Shepherd v. Dallas County* (N.D. Tex. 2008)). In *Shepherd*, the Court noted a condition of confinement was an "inadequate system" that "caused (him) to suffer a deprivation of his constitutional rights." *Id.* (*citing Palo, II*).  The United States Fifth Circuit Court of Appeals, in *Scott v. Moore*, stated that:

> where a detainee complains of the number of bunks in a cell or his television or mail privileges, the wrong of which the detainee complains is a general condition of confinement. In such cases, the reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), is apposite, as we may safely assume, by the municipality's very promulgation and maintenance of the

complained-of condition, that it intended to cause the alleged constitutional deprivation.

114 F.3d 51, 53 (5th Cir. 1997). In a footnote, the *Scott* court collected cases where the "conditions of confinement" standard had been found and applied.

> The following were deemed to be conditions-of-confinement cases: *Murphy v. Walker*, 51 F.3d 714 (7th Cir.1995) (revocation of telephone, television, and cigarette privileges); *Collazo-Leon v. United States Bureau of Prisons*, 51 F.3d 315 (1st Cir.1995) (disciplinary segregation and denial of telephone and visitation privileges); *United States v. Millan*, 4 F.3d 1038 (2d Cir.1993) (length of pre-trial detention); *Hause v. Vaught*, 993 F.2d 1079 (4th Cir.1993) (restriction on mail privileges); *Brogsdale v. Barry*, 926 F.2d 1184 (D.C.Cir.1991) (overcrowding); *Lyons v. Powell*, 838 F.2d 28 (1st Cir.1988) (22-23-hour confinement and placement of mattress on floor); *Fredericks v. Huggins*, 711 F.2d 31 (4th Cir.1983) (policy of refusing detainees access to drugs for rehabilitation); *Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981) (overcrowding).

*Scott v. Moore*, 114 F.3d 51, fn. 2 (5th Cir. 1997).

Most recently, the United States Fifth Circuit Court of Appeals, in addressing a failure to train claim, has said:

> Plaintiffs claim that the County denied Simpson adequate medical care by failing to train its jail employees. The district court examined this failure-to-train theory as a conditions-of-confinement claim. *Sanchez v. Young County (Sanchez II)*, No. 7:15-CV-00012-O, 2019 WL 280092, at *5 n.3 (N.D. Tex. Jan. 22, 2019). It should have examined this theory as an episodic-act-or-omissions claim. *See Flores*, 124 F.3d at 738 (treating the plaintiff's training- and staffing-based allegations as an episodic-acts-or-omissions claim even though the plaintiff attempted to plead them as a conditions-of-confinement claim). Failure-to-train claims are not conditions-of-confinement claims, so dismissing Plaintiffs' claim as such was error.

*Sanchez v. Young Cty., Texas*, 956 F.3d 785, 792 (5th Cir. 2020).

The United States Supreme Court has delineated a distinction between pretrial detainees and convicted criminals serving their sentences. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that convicted criminals challenges to "conditions of confinement" are measured against the Eighth Amendment to the United States

Constitution.[19] Pretrial detainees "have not been found guilty of a crime and therefore cannot be punished while in custody. To do so would punish them without due process of law." *Grabowski v. Jackson Cty. Pub. Defs. Office*, 47 F.3d 1386, 1395 (5th Cir. 1995), on reh'g en banc, 79 F.3d 478 (5th Cir. 1996). While regulation and restraints on liberty are necessary for the smooth running of an institution are not considered punishment – for example, confining an inmate to a cell or limiting an inmate's contact with the outside world – the Supreme Court articulated the following test to determine whether the challenged action amounts to punishment: "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees" *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S. Ct. 1861, 1874, 60 L. Ed. 2d 447 (1979).

Pretrial detainees have a constitutional right to medical treatment for "serious medical needs".[20] It is well established Fifth Circuit Law that pretrial detainees claims for denial of medical care under a "conditions of confinement" claim, are not measured against a deliberate indifference standard applied to convicted criminals, but, rather the standard announced by the *Wolfish* court: "if a restriction or condition is not reasonably related to a legitimate goal" then it is an unconstitutional action. *Wolfish* at 539.

---

[19] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[20] "Today, we conclude that pretrial detainees are entitled to reasonable medical care unless the failure to supply that care is reasonably related to a legitimate governmental objective. Furthermore, pretrial detainees are entitled to protection from adverse conditions of confinement created by prison officials for a punitive purpose or with punitive intent. We perceive this holding to be consistent with the criterion for conditions imposed on pretrial detainees set forth by the Supreme Court in *Bell v. Wolfish*. In so holding, we recognize that the distinction as to medical care due a pretrial detainee, as opposed to a convicted inmate, may indeed be a distinction without a difference, for if a prison official acted with deliberate indifference to a convicted inmate's medical needs, that same conduct would certainly violate a pretrial detainee's constitutional rights to medical care. However, we believe it is a distinction which must be firmly and clearly established to guide district courts in their evaluation of future cases involving the constitutionality of all conditions imposed upon pretrial detainees."
*Cupit v. Jones*, 835 F.2d 82, 85 (5th Cir. 1987)

c. *Analysis*

This court is persuaded that this lawsuit presents an episodic act or omission, thereby invoking the deliberate indifference standard. Yazoo City's policy was allegedly not being followed by Yazoo City Jail staff and, according to plaintiffs, resulted in the death of another inmate, William Billy Turner (hereinafter referred to as "Turner") prior to Williams' death. Plaintiffs say that Turner had been chewing on a fentanyl[21] patch in his cell and died as a result of a narcotics overdose. According to plaintiffs, Yazoo City's alleged failure to follow its medical screening policy resulted in Turner's death. Defendants argue that there is no evidence before this court of Turner's death besides the bald assertions of plaintiffs and, therefore, this court cannot consider such in evaluating the claims of plaintiffs.

This court agrees with defendants. "[C]onclusory, unsupported assertions are insufficient to defeat a motion for summary judgment." *Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Serv. Dist*., 134 F.3d 319, 324 (5th Cir. 1998) (Collecting cases *See, e.g*., *Clark v. America's Favorite Chicken Co*., 110 F.3d 295, 297 (5th Cir.1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."); *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir.1995) ("conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment"); *Krim v. BancTexas Group, Inc*., 989 F.2d 1435, 1449 (5th Cir.1993) (internal quotation marks and citation omitted) (summary judgment is appropriate if "nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

---

[21] Fentanyl, also spelled fentanil, is an opioid used as a pain medication and together with other medications for anesthesia. Fentanyl is also used as a recreational drug, often mixed with heroin or cocaine. It has a rapid onset and effects generally last less than two hours. Medically, fentanyl is used by injection, as a patch on the skin, as a nasal spray, or in the mouth.

## VIII.   FAILURE TO TRAIN CLAIMS

It is well-established that a municipality is a "person" subject to lawsuit under Section 1983. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); thus, a municipality may be sued if the plaintiff alleges that the municipality caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the officers of the municipality. *See City of St. Louis v. Prapotnik*, 485 U.S. 112 (1988). The municipality may also be subject to liability if its governmental custom causes a constitutional violation. *See Monell*, 436 U.S. at 690-91. The plaintiffs herein must prove three elements to prevail on their *Monell* claims under section 1983: a policymaker; an official policy or custom; and violation of constitutional rights resulting from the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Chief Lloyd testified as the 30(b)(6)[22] deponent for Yazoo City that the chief promulgates the policies for the YCPD Jail and presents such to the Board of Aldermen for approval. Chief Lloyd further testified that the Board of Aldermen was the final policymaker for the YCPD Jail. He later, however, testified that the chief of police acts as the final policy maker for the YCPD Jail.

This court finds that Chief Lloyd was the final policymaker for Yazoo City regarding all law enforcement decisions in Yazoo City, Mississippi. *See Moore v. City of Columbus*, No.

---

[22] (b) Notice of the Deposition; Other Formal Requirements. […]

> (6) Notice or Subpoena Directed to an Organization. In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30

1:12CV50-DAS, 2012 WL 2562841, at *2 (N.D. Miss. June 29, 2012) ("[T]he Chief of Police […] is held responsible for the practices, policies, and customs of a police department.") (Citing *Taylor v. Town DeKalb, Miss.*, Civ. Action No. 4:06CV124TSL–LRA, 2009 WL 1748523, 4 (S.D. Miss. June 19, 2009) (holding that under Mississippi law, chief of police is final policymaker vis-a-vis law enforcement); and MISS. CODE ANN. § 21–21–1[23].

A municipality may subject itself to liability by failing to train its officers in some fashion which results in a constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). To prevail on their "failure to train theory" the plaintiffs must demonstrate: (1) that Yazoo City's training procedures were inadequate, (2) that Yazoo City was deliberately indifferent in adopting or enforcing its training policy, and (3) that the inadequate training policy directly caused the constitutional violation in question. *See Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

> Inadequacy of police training can [] also serve as the basis for municipal liability under § 1983, but only if the failure to train amounts to a deliberate indifference to the rights of individuals who come into contact with the police. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This court has held that if the training of police officers meets state standards, there can be no cause of action for a failure to train absent a showing that "this legal minimum of training was inadequate to enable [the officers] to deal with the 'usual and recurring situations' faced by

---

[23] The marshal or chief of police shall be the chief law enforcement officer of the municipality and shall have control and supervision of all police officers employed by said municipality. The marshal or chief of police shall be an ex officio constable within the boundaries of the municipality, and he shall perform such other duties as shall be required of him by proper ordinance. Before performing any of the duties of his office, the marshal or chief of police shall give bond, with sufficient surety, to be payable, conditioned and approved as provided by law, in an amount to be determined by the municipal governing authority (which shall be not less than Fifty Thousand Dollars ($50,000.00)). The premium upon said bond shall be paid from the municipal treasury. If any marshal or chief of police shall fail to perform any of the duties of his office, it shall be the duty of the district attorney or county attorney upon receiving notice thereof to immediately file quo warranto proceedings against such official.

The provisions of this section shall be applicable to all municipalities of this state, whether operating under a code charter, special charter, or the commission form of government, except in cases of conflict between the provisions of this section and the provisions of the special charter of a municipality, or the law governing the commission form of government, in which case of conflict the provisions of the special charter or the statutes relative to the commission form of government shall control.

MISS. CODE. ANN. § 21-21-1 (West)

jailers and peace officers." *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir.1992).

*O'Neal v. City of San Antonio*, 344 F. App'x 885, 888 (5th Cir. 2009).

> Most recently, the Fifth Circuit has said:

> When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *See Duvall*, 631 F.3d at 208–09 (upholding jury finding that a county jail maintained an unconstitutional condition where there was evidence that the county policymaker knew of unconstitutional conditions yet failed to revise its policies); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city); *see also Piotrowski*, 237 F.3d at 578 n.18 (explaining that *Grandstaff* affirmed municipal liability because a policymaker's post-incident actions can ratify the prior misconduct).

*Sanchez v. Young Cty., Texas*, 956 F.3d 785, 793 (5th Cir. 2020).

This court must "consider compliance with state requirements as a factor counseling against a 'failure to train' finding." *Darden v. City of Fort Worth, Texas*, 808 F. App'x 246, 249 (5th Cir. 2020) (Quoting *Zarnow*, 614 F.3d at 171)). In support of their motion for summary judgment, the defendants provided this court with copies of the State of Mississippi Law Enforcement Officer Standards and Training Professional Certificates for: Tillmon; Lloyd; Banks; Harris; Dean; Thompson; and VanCleave. [Docket no. 98-13]. The defendants did not, however, provide the State of Mississippi Law Enforcement Officer Standards and Training Professional Certificates for either Jaco or Langston. During his deposition, Jaco testified that he was a State of Mississippi certified law enforcement officer. [Docket no. 98-6, P. 3-4]. Langston did not testify regarding her possession or lack of a State of Mississippi Law Enforcement Officer Standards and Training Professional Certificate.

"[A] plaintiff must allege with specificity how a particular training program is defective." *Darden* at 249 (Quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)). In this

lawsuit *sub judice*, the plaintiffs have alleged that Yazoo City failed to train its law enforcement officials to conduct medical screens when inmates are admitted to the Yazoo City Jail. The plaintiffs argued that the individual officers all testified during their depositions that they did not know about the existence of Yazoo City's policy that required the booking officer to fill out a medical receiving/screening form[24]. Yazoo City's policy states:

> When a person is being booked into the jail, the booking officer will complete the health screening portion of the booking form, asking the arrestee if he or she has a history of suicide attempts. A positive response and/or unusual behavior should be immediately brought to the attention of the Chief.

[Docket no. 106-20, P. 16]. The various defendants all testified that they did not know about the existence of the policy regarding medical screens. During Chief Lloyd's 30(b)(6) deposition, for example, the following exchange occurred:

> Q.     Okay. And I may have asked you this a minute ago, but did the Yazoo City Police Department have a document called a Medical Screening Form that they filled out for inmates being admitted to jail?
>
> A.     Not to my knowledge.
>
> Q.     Okay. Do you know why this policy refers to the completion of medical Screening Forms of inmates being admitted to jail if Yazoo City Police Department had no such document?
>
> A.     No.

[Docket no. 106-22, PP. 6-7]. It is clear to this court, from the record before it, that defendant Yazoo City failed to follow its own policies it had promulgated to protect the rights of inmates at the YCPD Jail.

---

[24] "It is the responsibility of the admission/booking officer on duty to make certain that the following procedures are followed without exception when an arrestee is brought to the jail by any law enforcement officer or any transporting agent.

The jailer or booking officer will make certain that all necessary records are complete.

[]Medical screening forms

The booking officer/jailer will complete the medical screening form whether or not the arrestee will be placed in a housing unit or released on bond." [Docket no. 106-20, P. 8].

"At the time of admission to the jail, each inmate will have a medical receiving/screening form filled out by the booking officer. The medical receiving/screening form will become a permanent part of the inmate's medical record and will be available to medical professionals for review at any time." [Docket no. 106-20, P. 15].

Fifth Circuit precedent is clear that *Monell* liability may not attach to a municipality merely because a city actor fails to follow the city's policy. *See Longino v. Hinds County, Miss. Ex rel. B.d of Sup'rs* 2014 WL 4545943 (S.D. Miss. Sept. 11, 2014) (Citing *Myers v. Klevenhagen*, 97 F.3d 91 (5th Cir. 1996)). United States District Court Judge Michael P. Mills of the Northern District of Mississippi, in *Cooper v. Brown*, spoke on this subject:

> It is, in the court's view, much more likely to indicate that the city may intend that its policy be followed but that it has failed to be sufficiently diligent in ensuring that such is the case. Clearly, allegations that a city adopted beneficial policies but has failed to follow them sound in simple negligence, not the sort of "deliberate indifference" which the Supreme Court has required to be shown in cases where municipalities are sought to be held liable for the acts of their employees based upon allegations of inadequate training, supervision or hiring. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

*Cooper v. Brown*, 156 F. Supp. 3d 818, 830–31 (N.D. Miss. Aug. 10, 2010), aff'd in part, appeal dismissed in part, 844 F.3d 517 (5th Cir. 2016)[25].

The United States Fifth Circuit Court of Appeals, in clarifying a failure to train claim, has said:

> If, in the light of the duties assigned to specific officers or employees the need for more or different training is so likely to result in the violation of constitutional rights, the policymakers of a city can reasonably be said to have been deliberately indifferent to the need, for which the city may be held liable if the failure to provide proper training, which may be viewed as a city policy, actually causes injury. [*Canton*] at 390, 109 S.Ct. 1197. The *Canton* Court emphasized that, for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. *Id*. at 391, 109 S.Ct. 1197. In other words, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform, and it must be proven

---

[25] The facts of *Cooper* are that Cooper fled on foot from the scene of a traffic stop for suspicion of driving under the influence of an intoxicant. Cooper concealed himself in a nearby garbage bin. The initiating officer simultaneously called for assistance over his police radio and Officer Pressgrove responded with his K9 police dog. The K9 discovered Cooper in the garbage bin and subsequently attacked Cooper. It is unknown whether Officer Pressgrove ordered the K9 to attack or whether the K9 attacked of her own accord. In either event, Cooper suffered serious leg injuries from the K9's attack. The city had a K9 policy in place that Officer Pressgrove failed to follow which required the use of K9 units only where they are requested by the initiating unit or the on-scene supervisor where it is determined that the crime involved is significant enough to warrant the deployment of the K9.

that the identified deficiency in training actually caused the failure of the
employee or officer to perform his duty constitutionally, i.e., that the injury would
have been avoided had the employee been trained under a program that was not
deficient in the identified respect. *Id*.

*Burge v. Parish of St. Tammany*, 187 F.3d 452, 472 (5th Cir. 1999).

In order to succeed at this stage, the City must show that there is no genuine
dispute as to a material fact regarding (1) whether there was an inadequacy in the
City's training policy; (2) whether the City was deliberately indifferent in its
adoption of that policy; or (3) whether the inadequate training policy directly
caused the constitutional violation allegedly suffered by [the decedent].

*Darden v. City of Fort Worth, Texas*, 808 F. App'x 246, 249 (5th Cir. 2020) (Citing *Sanders-*

*Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Zarnow v. City of Wichita Falls*, 614

F.3d 161, 170 (5th Cir. 2010)).

In limited circumstances, a local government's decision not to train certain
employees about their legal duty to avoid violating citizens' rights may rise to the
level of an official government policy for purposes of § 1983." *Connick v.
Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). "A
municipality's culpability for a deprivation of rights is at its most tenuous where a
claim turns on a failure to train." *Id*. To establish liability under § 1983, "a
municipality's failure to train its employees in a relevant respect must amount to
deliberate indifference to the rights of persons with whom the untrained
employees come into contact." *Id*. (internal alterations and quotation marks
omitted). To establish deliberate indifference with regard to training, a plaintiff
must show that policymakers were "on actual or constructive notice that a
particular omission in their training program causes [municipal] employees to
violate citizens' constitutional rights." *Id.*

Within the context of a failure to train claim, "[d]eliberate indifference can be
proven in two ways. First, plaintiffs can show that a pattern of similar incidents
put the municipality on notice that its training was producing unconstitutional
results." *Anderson v. Marshall* Cty., 637 Fed.Appx. 127, 134 (5th Cir.2016).
Accord, *Kitchen v. Dallas Cty.*, 759 F.3d 468, 484 (5th Cir.2014). Alternatively,
"plaintiffs can show that the 'single incident exception' applies, in which case
proving a pattern is unnecessary." *Id*. To qualify for the single incident exception,
a plaintiff must show "a constitutional violation would result as the highly
predictable consequence of a particular failure to train." *Id*., 759 F.3d at 484
(internal quotation marks omitted).

*Riggins v. City of Indianola, Mississippi*, 196 F. Supp. 3d 681, 693 (N.D. Miss. 2016).

32

> [Plaintiff] need[s] to demonstrate that, absent further training, it was "highly predictable" that prison officials would be "confounded" by decisions about whether to summon emergency medical care. [Plaintiff] had to demonstrate that this was "so predictable that failing to train the [prison officials] amounted to conscious disregard" for a prisoner's right to medical care.

*Cardenas v. Lee Cty., Tex.*, 569 F. App'x 252, 258 (5th Cir. 2014) (Quoting *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1365 (2011)).

This court is persuaded that the parties have presented a genuine dispute as to whether the constitutional violation allegedly suffered by Williams was the "highly predictable" consequence of Yazoo City's failure to train its officers. The plaintiffs herein have provided evidence to this court from which this court could find that Yazoo City's failure to train its officers on the use of medical screening forms sounds in something more than simple negligence. The failure of Yazoo City to train its officers in the use of its medical screening forms before admission of inmates to its jail, based upon the facts before this court, could have contributed to Williams' death. A finder of fact must determine whether this failure amounts to the deliberate indifference which would subject Yazoo City to liability.

Plaintiffs' failure to train theory also proposes a second, different, but related basis for municipal liability: that the City should have provided adequate medical training to the officers involved in the arrest/detention of Williams, which medical training would have caused them to recognize the emergency predicament enveloping Williams.

The Fifth Circuit Court of Appeals has spoken of this theory:

> It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious [medical issues]. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that the officers will unerringly detect [serious medical needs]. The latter requires the skills of an experienced medical professional [], an ability beyond that required of the average police officer by the due process clause.

33

*Burns v. City of Galveston, Tex.*, 905 F.2d 100, 104 (5th Cir. 1990).

This court is aware that failure to train claims poses a high hurtle for plaintiffs to surmount. *See Brumfield v. Hollins*, 551 F.3d 322 (5th Cir. 2008) (holding that defendants were due qualified immunity on plaintiffs' failure to train claims where: decedent was intoxicated when he was booked; decedent asked for help which was denied; and decedent hung himself after the denial of help); *See also Brown v. Callahan* 623 F.3d 249 (5th Cir. 2010) (finding no "deliberate indifference" where: decedent informed intake nurse of his medical conditions; vomited blood during his confinement; did not have access to his medicine; and died while in custody); *Bush v. LaFourche Parish Council*, 2012 WL 258596 (E.D. La. Jan. 26, 2012) (finding the defendants were not deliberately indifferent where: officers conducted a medical screen within 72 hours of his booking; an EMT conducted a preliminary medical screen when he was arrested; and decedent committed suicide while in custody). At this time during these proceedings, this court is not called upon to make credibility determinations. This court, instead, must determine whether the parties have presented genuine disputes of material fact that should be presented to the ultimate finder of fact. This court concludes that the parties have done so.

This court is persuaded that Yazoo City's failure to train its officers in its own policies presents a genuine dispute as to whether the constitutional violation allegedly suffered by Williams was the "highly predictable" consequence of Yazoo City's failure to train its own officers. Plaintiffs' proof when viewed in the light most favorable to them, creates several disputes of material fact about whether the jail had a *de facto* policy of inadequately training and supervising its employees about maintaining proper medical care for the inmates of the jail.

This court now turns to the remaining defendants. Since all of them raise the defense of qualified immunity, the court will begin with that concept.

## IX.    QUALIFIED IMMUNITY

Qualified immunity shields government officials from civil liability if their conduct does not violate a clearly established constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is not just immunity from judgment, but rather is immunity from all aspects of suit. *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986). To avoid dismissal, the plaintiff must assert specific facts which, if true, would defeat qualified immunity. *Wicks v. Mississippi State Employment Servs.*, 41 F.3d 991, 994–997 (5th Cir. 1995), cert. denied, 515 U.S. 1131, 132 L.Ed.2d 809 (1995).

> A qualified immunity defense alters the usual summary judgment burden of proof. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir.2005). Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. *Id*. The plaintiff bears the burden of negating qualified immunity, *id*., but all inferences are drawn in his favor.
>
> The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir.2009).

*Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

When determining whether qualified immunity is applicable, courts consider "only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017)(Citing *Kingsley v. Hendrickson*, 576 U. S. ___, ___, 135 S. Ct. 2466; 192 L. Ed. 2d 416, 428 (2015)). To show a violation of a clearly established right, and thus overcome the defense of qualified immunity, there must exist a previous case wherein "an officer acting under similar circumstances" was held to have violated the United States Constitution. *Id*. at 552. In other words, "in the light of pre-existing law the unlawfulness must be apparent," *Id*. (Citing *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034 (1987)).

>    *a.  Unlawful Arrest*

"The Fourth Amendment[26] requires that an arrest be supported by a properly issued arrest warrant or probable cause." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001); *see also Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1189 (5th Cir. 1991) ("there is no cause of action for false arrest under section 1983 unless the arresting officer lacked probable cause.").

This lawsuit *sub judice* does not present this court with an arrest warrant. This court must determine, therefore, whether the officers possessed probable cause to arrest Williams – and if they possessed probable cause, for what criminal charge could the officers arrest Williams. Probable cause depends on "the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." *Fields*, 922 F.2d at 1189.

YCPD officers arrested Williams for simple assault – domestic violence in violation of Mississippi Code § 97-3-7[27]. Under Mississippi law, this charge is characterized as a

---

[26] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV

[27] (1)(a) A person is guilty of simple assault if he

>    (i) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another;
>
>    (ii) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or
>
>    (iii) attempts by physical menace to put another in fear of imminent serious bodily harm; and, upon conviction, he shall be punished by a fine of not more than Five Hundred Dollars ($ 500.00) or by imprisonment in the county jail for not more than six (6) months, or both.

>    (b)  However, a person convicted of simple assault upon any of the persons listed in subsection (14) of this section under the circumstances enumerated in subsection (14) shall be punished by a fine of not more than One Thousand Dollars ($ 1,000.00) or by imprisonment for not more than five (5) years, or both.

(3)  (a) When the offense is committed against a current or former spouse of the defendant or a child of that person, a person living as a spouse or who formerly lived as a spouse with the defendant or a child of that person, a parent, grandparent, child, grandchild or someone similarly situated to the defendant, a person who has a current or former dating relationship with the defendant, or a person with whom the defendant has had a biological or legally adopted child, a person is guilty of simple domestic violence who:

>    (i) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another;
>
>    (ii)  Negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or
>
>    (iii)  Attempts by physical menace to put another in fear of imminent serious bodily harm.

misdemeanor/felony, a felony when the assault is perpetrated in one of two ways: where the perpetrator has been convicted of domestic violence at least two (2) times in the past seven (7) years; or where the perpetrator commits an assault by "(i) [attempting] to cause serious bodily injury to another, or causes such an injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (ii) [attempting] to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (iii) [by strangling, or attempting] to strangle another." Miss. Code. Ann. § 97-3-7 (West). In order to constitute domestic violence in Mississippi, the proscribed acts must be committed against "a current or former spouse of the defendant or a child of that person, a person living as a spouse or who formerly lived as a spouse with the defendant or a child of that person, a parent, grandparent, child, grandchild or someone similarly situated to the defendant, a person who has a current or former dating relationship with the defendant, or a person with whom the defendant has had a biological or legally adopted child." Miss. Code. Ann. § 97-3-7 (West).

Since Lavina and Williams were in a dating relationship and his acts were against a person with whom defendant had a biological child, Williams faced a misdemeanor charge.

The elements of simple assault – domestic violence require proof of the following: that Williams "had committed simple assault by 'purposely, or knowingly or recklessly causing bodily injury to [someone covered in the statute]; . . .' striking [that person]; 'who has a current or former dating relationship with the defendant . . . .' [or a person with whom defendant had a biological child] Miss. Code Ann. § 97-3-7(3)." *Mills v. City of Water Valley*, 66 So. 3d 193, 195 (Miss. App. 2011).

---

Upon conviction, the defendant shall be punished by a fine of not more than Five Hundred Dollars ($ 500.00) or by imprisonment in the county jail for not more than six (6) months, or both.
Miss. Code Ann. § 97-3-7 (Lexis Advance through the 2017 Regular and 1st Extraordinary Sessions)

The relevant facts as presented by the parties in this lawsuit *sub judice* show the following: Williams and Lavina had argued about Williams' affair with a female co-employee; Lavina blared her suspicion; Williams denied the accusation, although Williams' mother, Donnie, confirmed the actuality of the affair later in her deposition; during that argument, Williams supposedly struck Lavina multiple times on her body; Lavina had marks on her body, supposedly from Williams hitting her; Lavina struck Williams; Lavina's relatives arrived and intervened; Lavina's cousin called law enforcement to report the attack; four (4) YCPD officers went to Williams' residence to investigate; those officers observed signs which persuaded them that Williams was intoxicated; Lavina told the officers that Williams had assaulted her; Williams admitted he had struck Lavina; and after their investigation concluded, YCPD officers placed Williams under arrest for simple assault – domestic violence.

This court is persuaded that the officers possessed probable cause to arrest Williams for simple assault – domestic violence. Furthermore, in their response in opposition to the defendants' motion for summary judgment, the plaintiffs have conceded their unlawful arrest claim.[28] [Docket no. 31]. Accordingly, this court finds that the defendants are entitled to summary judgment on the plaintiff's claim in their complaint accusing the police officers of unlawful arrest.

### b.  Excessive Force

To succeed on their excessive force claim, Plaintiffs must establish "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). "The calculus of reasonableness must embody allowance for the fact

---

[28] III. PLAINTIFFS WITHDRAW THEIR UNLAWFUL ARREST CLAIM
  3.53 Plaintiffs withdrawal has no effect on other claims against Officer Harris.

that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016).

> Whether the force used was objectively unreasonable depends on the facts and circumstances of the particular case and includes 1) the severity of the crime, 2) whether the suspect posed an immediate threat to the safety of the officer or others and 3) whether the plaintiff was actively resisting arrest or was attempting to evade arrest. *Gutierrez v. City of San Antonio*, 139 F. 3d 441, 447 (5th Cir. 1998). The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, rather than 20/20 hindsight. *Id.* If the law did not put the officer on notice that his conduct would clearly be unlawful, summary judgment based upon qualified immunity is appropriate. *Hill v. Carroll County, Mississippi*, 467 F. Supp. 2d 696, 702 (N.D. Miss. 2006).

*Brister v. Walthall Cty. Sheriff Deputies*, No. 2:05cv2045KS-MTP, 2007 U.S. Dist. LEXIS 56262, at *24-25 (S.D. Miss. Aug. 1, 2007).

The undisputed facts of this lawsuit are: that YCPD officers responded to Williams' house to investigate a domestic violence altercation; that Williams admitted he had committed domestic violence on Lavina; that Williams was arrested by YCPD officers who attempted to escort Williams to their patrol car; that Williams was intoxicated, having earlier consumed an alcoholic beverage; that Williams began resisting arrest making it difficult for the officers to gain control over him to escort him to the police cruiser and place him therein; that Lt. Harris sprayed Williams on the shoulder with a one second burst of mace in order to regain compliance; and that immediately thereafter Williams obeyed the commands of the officers.

The plaintiffs have provided no evidence to this court of an injury sustained by Williams as a result of the application of the mace spray. Even so, the Fifth Circuit has found that the application of mace causes only a *de mimimus* injury:

> Bradshaw alleged that the district court abused its discretion in dismissing his claim that Norwood used excessive force against him; he alleged that Norwood sprayed him with mace when he refused to accept his new cell assignment

> because he did not want to live with a white inmate. Bradshaw alleged that he
> suffered burning eyes and skin for approximately 24 hours, twitching of his
> eyes, blurred vision, irritation of his nose and throat, blistering of his skin, rapid
> heartbeat, mental anguish, shock and fear as a result of the use of mace. He has
> not shown that he suffered more than a *de minimis* injury or that the force used by
> Norwood was objectively unreasonable under the circumstances. *See Williams v.
> Bramer*, 180 F.3d 699, 703, clarified on reh'g, 186 F.3d 633, 634 (5th Cir.1999);
> *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir.1996).

*Bradshaw v. Unknown Lieutenant*, 48 F. App'x 106 (5th Cir. 2002). "The injury must be more

than a *de minimis* injury and must be evaluated in the context in which the force was deployed."

*Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

This court is persuaded that the plaintiffs *sub judice* similarly have failed to meet their

burden in showing that Williams suffered an injury, or that the force used by Lt. Harris was

objectively unreasonable. Accordingly, this court finds that the defendants' motion for summary

judgment on the plaintiffs' claims for excessive force is well taken and must be granted.

### c. Denial of Medical Care

The Fourteenth Amendment requires a state to provide for the "basic human needs" of

pretrial detainees, including the right to adequate medical care. *See Hare v. City of Corinth*, 74

F.3d 633, 639 (5th Cir. 1996) (en banc). To establish a denial of medical care, a detainee must

show that the government official acted with deliberate indifference to his serious medical needs.

*Id.* at 647–48. As stated above, deliberate indifference means that (1) officials were "aware of

facts from which an inference of substantial risk of serious harm could be drawn; (2) the

official[s] actually drew that inference; and (3) the official[s'] response indicates the official[s]

subjectively intended that harm occur." *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th

Cir. 2001) (emphasis added). "A jail official is deliberately indifferent to an inmate's medical

needs and suicide prevention needs in violation of the inmate's constitutional rights if the official

was subjectively aware of the risk and disregarded the risk by failing to take reasonable measures

to abate it." *Estate of Stacks v. Prentiss Cnty., Miss.*, 2013 WL 1124395, *4 (N.D. Miss. Mar. 18, 2013). "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Mere negligence on the part of prison officials is insufficient. *Hare*, 74 F.3d at 645–46.

### i.  Jailer Langston

The undisputed facts as related to Jailer Langston are as follows: Langston was not present when Williams was booked into the jail; Lt. Harris informed Langston that Williams was intoxicated; no officer informed Langston that Williams had medical issues; inmates Diew, Cheatham, and Parker allege that Williams told them he needed medical attention; and Langston had some contact with the detainees to ask them to calm down.

The disputed facts as relates to Jailer Langston are as follows: inmates Diew, Cheatham, and Parker allege that they banged on the cell walls for approximately two (2) to three (3) hours, which Langston says never happened; Diew, Cheatham, and Parker allege that the jail cells had intercoms which Langston refutes, saying that the cells, at the time, did not; Diew, Cheatham, and Parker allege that they told Langston that Williams needed medical attention, which Langston refutes by saying the detainees were asking her if they could use the phone; Diew, Cheatham, and Parker allege that Langston told them she could not open the cell for Williams until the Lieutenant arrived back at the jail, which allegation Langston denies; and Langston says that she conducted hourly cell-checks, which Diew, Cheatham, and Parker allege never happened.

This court finds there are numerous genuine disputes of material fact which would impact on a determination whether Langston acted with deliberate indifference with respect to Williams' medical needs. Accordingly, this court, in obedience to the mandates of Rule 56 of the Federal

Rules of Civil Procedure, denies the motion for summary judgment as to Langston on the plaintiffs' claims for denial of medical care.

## ii. Other Officers

Were this court to assess defendants' motion for summary judgment relative to the other officers based solely upon their conduct at the scene of the arrest, this court would grant to them summary judgment. They knew that Williams had been attacked by Calvin Smith and that Calvin Smith had struck Williams in the side with some metal object. Officer Dean had checked Williams' side and did not observe any injury. Williams appeared intoxicated, so all of the officers on the scene reasoned that Williams' conduct was manifested by alcohol. The officers did not know that Williams might bleed internally from the Calvin Smith-inflicted injury.

The night's/early morning affair did not end there, however. Once at the police station, in spite of YCPD jail written policy, none of the officers filled out a medical screening form; Williams' mother says she informed Lt. Harris that "[Williams] had a condition with his platelets being low and if he got hurt physically in any kind of way, that his blood wouldn't clot, that his blood would just bleed (*sic*), he would just bleed"; Williams' sister echoed those statements and added that "he could die"; Williams' mother testified at her deposition that Officer Banks said that Williams had passed out in the patrol car on the way to the police department. Further, according to inmates Parker, Diew, and Cheatham, two officers had dragged Williams down the jail hallway while Williams was alternatively asking for medical treatment or his medicine and the officers ignored Williams' requests.

Yet, none of the officers present, Lt. Harris, Officer Dean, Officer Banks, Officer Jaco, or Officer VanCleve did anything. Neither one took any steps to verify or refute the statements of Williams' mother and sister. Neither officer, on this record, even walked the few steps to

Williams' cell physically to observe him, or to question him about his medical condition. And, further, on this record, neither officer even suggested taking Williams to a hospital, or alerting some medical personnel of the mentioned danger.

Based on the relevant, undisputed facts as to these officers, and the disputed facts which at trial might be resolved in plaintiffs' favor, this court finds that the plaintiffs have presented enough competent evidence to this court to survive summary judgment. On the record before this court, the officers possessed enough information to conclude that Williams may have been seriously injured and that he might be bleeding internally. Moreover, they were aware, taking all factual disputes in a light most favorable to the plaintiffs, that Williams had requested medical attention and/or asked for his medication. This court is aware that a conflict exists between the inmates and Williams' mother on this point. She says Williams had stopped taking medication, while the inmates say he was asking for his medication. Their testimony could be reconciled if Williams simply recognized a need for the discontinued medication and wanted his mother to bring such to the jail. This court concludes that, on this record, summary judgment is not appropriate here.

## X.      MISSISSIPPI STATE LAW TORT CLAIMS

The plaintiffs have asserted claims for the intentional torts of assault, battery, and intentional infliction of emotional distress against the officers in their individual capacity. A claim against an officer in his/her individual capacity means, if successful, the plaintiffs would be entitled to damages from the monies of the individual defendants.

The defendants first attack plaintiffs' intentional tort state law claims, arguing that these claims all fail as a matter of law. Since, the plaintiffs say that they have presented evidence

sufficient to allow them to present their case to a jury for a factual determination on the merits, this court must examine these claims under the jurisprudential spotlight of Rule 56.

The plaintiffs have also asserted claims sounding in negligence: simple negligence; and negligent infliction of emotional distress. The defendants say that the plaintiffs' tort law claims sounding in negligence, too, all fail as a matter of law. The plaintiffs again say that they have presented evidence sufficient to allow them to present their case to a jury for a factual determination on the merits. The arguments of both sides are studied below.

### a.  *Notice Requirement of the Mississippi Tort Claims Act*

The defendants say the plaintiffs and intervenors failed to comply with the notice requirements of the Mississippi Tort Claims Act by failing to serve notice on the Yazoo City Clerk's Office of their lawsuit allegations as required by MISS. CODE ANN. § 11-46-11[29]. The

---

[29] (1) After all procedures within a governmental entity have been exhausted, any person having a claim under this chapter shall proceed as he might in any action at law or in equity, except that at least ninety (90) days before instituting suit, the person must file a notice of claim with the chief executive officer of the governmental entity.

(2)(a) Service of notice of claim shall be made as follows:

    (i) For local governments:

        1. If the governmental entity is a county, then upon the chancery clerk of the county sued;

        2. If the governmental entity is a municipality, then upon the city clerk.

    (ii) If the governmental entity to be sued is a state entity as defined in Section 11-46-1(j), or is a political subdivision other than a county or municipality, service of notice of claim shall be had only upon that entity's or political subdivision's chief executive officer. The chief executive officer of a governmental entity participating in a plan administered by the board pursuant to Section 11-46-7(3) shall notify the board of any claims filed within five (5) days after receipt thereof.

    (b) Every notice of claim shall:

        (i) Be in writing;

        (ii) Be delivered in person or by registered or certified United States mail; and

        (iii) Contain a short and plain statement of the facts upon which the claim is based, including the circumstances which brought about the injury, the extent of the injury, the time and place the injury occurred, the names of all persons known to be involved, the amount of money damages sought, and the residence of the person making the claim at the time of the injury and at the time of filing the notice.

(3)(a) All actions brought under this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after, except that filing a notice of claim within the required one-year period will toll the statute of limitations for ninety-five (95) days from the date the chief executive officer of the state entity or the chief executive officer or other statutorily designated official of a political subdivision receives the notice of claim.

plaintiffs counter that they filed a Notice of Claim Letter in compliance with the Mississippi Tort Claims Act on March 11, 2015, although their Notice was not filed prior to suit.

The salient facts are as follows: the plaintiffs' filed their initial complaint in this federal forum on February 17, 2015. One (1) month later, on March 11, 2015, the plaintiffs filed their Notice of Claim Letter with the Yazoo City Clerk's Office. Plaintiffs then waited ninety (90) days before filing their amended complaint, filing same on June 11, 2015. Their first complaint alleged that Williams had died during the night/early morning hours of May 18 – 19, 2014, and that the improper, unconstitutional actions of various Yazoo City Police Officers were the basis of the complaint's demand for a finding of liability and damages. The original complaint contained no state law causes of action governed by the Mississippi Tort Claims Act; instead the plaintiffs asserted only grounds for relief under Title 42 U.S.C. § 1983.

The defendants reply that the plaintiffs offer no authority to support the plaintiffs' position that they may file a notice of claim letter on state law causes of action after a lawsuit already had been filed alleging solely federal claims. Say defendants, "[t]he purpose of the [Mississippi Tort Claims Act's] notice requirement is to inform governmental entities of a

---

(b) No action whatsoever may be maintained by the claimant until the claimant receives a notice of denial of claim or the tolling period expires, whichever comes first, after which the claimant has an additional ninety (90) days to file suit; failure to file within the time allowed is an absolute bar to any further proceedings under this chapter.

(c) All notices of denial of claim shall be served by governmental entities upon claimants by certified mail, return receipt requested, only.

(d)(i) To determine the running of limitations periods under this chapter, service of any notice of claim or notice of denial of claim is effective upon delivery by the methods statutorily designated in this chapter.

    (ii) The limitations period provided in this section controls and shall be exclusive in all actions subject to and brought under the provisions of this chapter, notwithstanding the nature of the claim, the label or other characterization the claimant may use to describe it, or the provisions of any other statute of limitations that would otherwise govern the type of claim or legal theory if it were not subject to or brought under the provisions of this chapter.

(4) From and after April 1, 1993, if any person entitled to bring any action under this chapter shall, at the time at which the cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the action within the time allowed in this section after his disability shall be removed as provided by law. The savings in favor of persons under disability of unsoundness of mind shall never extend longer than twenty-one (21) years.

MISS. CODE. ANN. § 11-46-11 (West)

potential future lawsuit, and to 'encourage corrective action'." [Docket no. 111, P. 13] (Citations omitted).

This court is persuaded that the plaintiffs have complied with the spirit of the Mississippi Tort Claims Act's notice requirement. When they filed their Notice of Claim Letter with the City on March 11, 2015, the plaintiffs' notice fell within the timeframe envisioned by the MCTA. Further, the plaintiffs waited until after the expiration of the ninety (90) day period required by the MCTA before amending their complaint to add the state law causes of action.

The plaintiffs' Notice of Claim Letter [Docket no. 106-24] placed Yazoo City on notice for almost all the state law claims they alleged in their Third Amended Complaint. [Docket no. 93]. Specifically, the plaintiffs' Notice of Claim Letter states:

> The claims against the aforementioned individuals and entities include, but are not limited to the following:
> Assault
> Battery
> Intentional infliction of emotional distress
> Negligent infliction of emotional distress
> False imprisonment
> Failure to provide medical care
> Gross negligence in failure to provide medical care
> General negligence
> Wrongful Death (State and Federal)
> Excessive Force
> Violation of State Constitutional rights
> Failure to train officer and employees on how to respond to emergency medical situations
> Failure to have policy on how to respond to emergency medical situations
> Failure to discipline
> Failure supervise
> Failure to have an adequate policy on how to respond to emergency medical situations
> Loss of consortium
> Deprivation of Constitutional Rights
> Violations of Due Process

[Docket no. 106-24, P. 4]. This court notes that the plaintiffs did not assert that any of the defendants should be on notice that they would be liable for either intentional infliction of emotional distress based on bystander recovery, or for negligent infliction of emotional distress based on bystander recovery.

This court finds, therefore, that the plaintiffs failed to place the defendants on notice of their intent to pursue intentional infliction of emotional distress based on bystander recovery or negligent infliction of emotional distress based on bystander recovery. It is, accordingly, this court's finding that the mandates of the MCTA have not been satisfied as to these specific two claims of the plaintiffs.

In summary, this court is not persuaded by the defendants' argument that the plaintiffs failed to comply with the MCTA's notice requirement as to the other state law causes of action in their Third Amended Complaint. Accordingly, this court denies the defendants' motion for summary judgment based on this argument as to the plaintiffs' state law claims for: assault; battery; negligent infliction of emotional distress; and negligence. The court now will address these claims.

#### b.  Assault and Battery Claims

The plaintiffs' state law claims for battery and assault are similarly positioned: both require proof of some basic elements, while battery requires proof of an additional element.

> Assault and battery are intentional torts. Assault occurs where a person (1) acts intending to cause a harmful or offensive contact with another person or an imminent apprehension of such contact and (2) the other person is put in such a state of imminent apprehension. *Morgan v. Greenwaldt*, 786 So.2d 1037, 1043 (Miss. 2001). Battery requires an additional element that the contact actually occurs. Id. "An intentional tort is an act of intentional behavior designed to bring about the injury." *Stevens v. FMC Corp*., 515 So. 2d 928 (Miss. 1987).

*Guiher v. Newcomb*, No. 1:07-cv-691-JMR-JMR, 2008 U.S. Dist. LEXIS 77732, at *11 (S.D. Miss. Oct. 3, 2008). Assault and battery both require the defendant to have acted with intention to cause a harmful or offensive contact with another person. "[I]n effectuating an arrest, a police officer 'may exert such physical force as is necessary to effect the arrest by overcoming the resistance he encounters.'" *Wallace v. Harber*, No. 91-7309, 1993 U.S. App. LEXIS 38559, at *10 (5th Cir. Mar. 19, 1993) (*quoting Holland v. Martin*, 214 Miss. 1, 9, 56 So. 2d 398, 400 (1952)). Law enforcement, in effectuating an arrest, certainly intend to cause contact with another person for the purpose of arresting such person for that offender's illegal action. This contact, however, under these facts, does not fall within the purview of the intentional torts of assault and battery.

The plaintiffs argue that the use of mace on Williams by Lt. Harris constituted assault and battery. As discussed *supra* in Section IX(b), the evidence submitted by the parties in this matter indicate that Williams was actively resisting when Lt. Harris applied the mace, an application, which under the evidence submitted to this court, appears justified and reasonable. This court, thus, is unpersuaded that Lt. Harris' application of the one-second spray of mace to a resistant Williams' shoulder constituted assault and battery.

Accordingly, this court finds that the defendants should be granted summary judgment in their favor on the plaintiffs' state law claims for the intentional torts of assault and battery.

### c.   *Negligence Claims*

In their Third Amended Complaint, the plaintiffs have also alleged negligence based on two (2) theories: that the defendants denied medical care to Williams; and that the defendants negligently "dragg[ed] and mac[ed]" Williams while in handcuffs. To prevail on their claim for negligence the plaintiffs would have to prove: that the defendants owed Williams a duty; that the

defendants breached that duty; that the defendants' breach of the duty of care was the proximate cause of an injury to Williams; and damages. *See Mladineo v. Schmidt*, 52 So.3d 1154, 1162 (Miss. 2010).

As an initial matter, this court finds that the individual defendants cannot be held personally liable for any negligence allegedly committed by them while they are acting in the normal course of their duties as employees of the municipality.

> (2)  An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

Miss. Code Ann. § 11-46-7.

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: []
>> (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury;

Miss. Code. Ann. § 11-46-9 (West).

The plaintiffs have not alleged that any of the individual officer's conduct constituted "fraud, malice, libel, slander, defamation or any criminal offense." They have, however, claimed that the individual defendants committed intentional torts, which this court discussed *supra*.

The plaintiffs have provided this court with ample evidence of genuine disputes of material fact that would indicate that the officers in question acted with "reckless disregard for the safety and well-being" of Williams. This court relies upon the court's earlier discussion

whether the officers acted with deliberate indifference to Williams' medical needs. Accordingly, this court finds that the negligence claims against the individual defendants: Lt. Harris; Officer Dean; Officer Banks; Officer Jaco; and Officer VanCleve shall stand.

This court has already addressed the plaintiffs' claim about the defendants' use of mace on Williams in the context of intentional torts. The plaintiffs' claim for negligence stands in a different posture. As courts in the Fifth Circuit Court of Appeals have held:

> [I]n a case involving allegations of unlawful arrest and assault brought against a police officer, the court held that language in the complaint alleging negligence was "of no moment" because the complaint "states a claim generically akin to a common law assault and battery." *City of Mound Bayou v. Johnson*, 562 So. 2d 1212, 1215 (Miss. 1990). *See also Childers v. Beaver Dam Plantation, Inc*., 360 F. Supp. 331, 334 (N.D. Miss. 1973) and *McGee v. Willbros Constr*., US, L.L.C., No. 5:11cv80DCB-JMR, 2011 U.S. Dist. LEXIS 148469, 2011 WL 6781434 at *2 (S.D. Miss. Dec. 27, 2011)

*Maas v. City of Ocean Springs*, No. 1:11-CV-287-LG-RHW, 2012 U.S. Dist. LEXIS 92696, at *8 (S.D. Miss. July 5, 2012). This court, therefore, is persuaded that the plaintiffs cannot maintain their claim for negligence based on the application of mace spray to Williams during his arrest.

This court must next address the plaintiffs' claim for the negligent denial of medical care. The plaintiffs' claim is that when the defendants placed Williams in custody, they should have provided medical care for his internal liver injury that was not readily apparent. The plaintiffs say that Williams and/or his mother informed the officers that Williams was experiencing complications from Lavina's brother striking Williams in the side with a metal object: that injury may or may not have caused Williams to begin bleeding internally from his liver. The court notes that the plaintiffs have provided no expert witness to explain how Williams' liver injury caused his death or how being struck in the side caused Williams' liver disease to start bleeding internally. Plaintiffs, however, point to the autopsy report which states that that Williams, a 24

50

year-old, had a past medical history of hepatic cirrhosis and pancytopenia. Plaintiffs say this language is enough to allege that Williams died of natural causes related to "complications of hepatic cirrhosis."

The evidence before this court is: Lavina and Williams fought that evening; Calvin struck Williams with a metal object before YCPD officers arrived on the scene; Lavina did not know what Williams' liver disease entailed or how it could impact him; Williams never told the officers that he had cirrhosis of the liver; Williams was intoxicated and that he was acting as if he was intoxicated; Officer Dean checked Williams for injury after finding out Williams had been struck with a metal object and observed no injury to Williams; Sgt. Thompson booked Williams into the jail but failed to fill out the medical screening form in violation of YCPD policy; Donnie did not know how or where Williams was injured, only that he had been struck with a pipe; and that Donnie and Williams' sister both informed the officers at the station that Williams had a medical condition, telling the officers that "he could die" from internal bleeding. Finally, inmates Parker, Diew, and Cheatham, testified that two officers dragged Williams down the jail hallway while Williams was alternatively asking for medical treatment or for his medicine and the officers ignored Williams' requests. Accordingly, since the officers knew of Williams' injury; learned from his family how serious that injury could be; took no steps to investigate the veracity of the danger, neither by checking on Williams, nor even speaking with him, this court finds that plaintiffs' claim for denial of medical care survives summary judgment.

### d. *Negligent Infliction of Emotional Distress*

This court finds, for the same reasons stated *supra*, that Mississippi jurisprudence does not allow negligence claims against individual officers. *See* Section IV(d)(iii)

This court must next determine whether Yazoo City, Mississippi can be held liable for negligent infliction of emotional distress. Mississippi law provides protection for law enforcement officers and the governmental entities for which they work in the normal execution of their duties.

> (1)  A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>> (c)  Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury;

Miss. Code Ann. § 11-46-9.

Thus, by Mississippi statute, plaintiffs must prove in this case that the individual officers acted with "reckless disregard to the safety and well-being of any person not engaged in criminal activity at the time of the injury to prevail" against Yazoo City. Reckless disregard does not encompass negligent acts. *See Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)[30].

Accordingly, this court is persuaded that summary judgment is appropriate on the plaintiffs' claims for negligent infliction of emotional distress.

## XI.    CONCLUSION

**IT IS, THEREFORE, ORDERED that the defendants' Motion for Summary Judgment [Docket no. 98] is hereby GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED that the following claims based in federal law are hereby DISMISSED WITH PREJUDICE: Title 42 U.S.C. § 1983 – Excessive Force; and Title 42 U.S.C. § 1983 – False Arrest.**

---

[30] "'Disregard' of the safety of others is at least negligence if not gross negligence. Because 'reckless' precedes 'disregard,' the standard is elevated." *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999)

IT IS FURTHER ORDERED that the following Mississippi State law claims are hereby DISMISSED WITH PREJUDICE: Assault; Battery; Negligence; Negligent Infliction of Emotional Distress; Negligent Infliction of Emotional Distress Based on Bystander Liability; and Intentional Infliction of Emotional Distress Based on Bystander Liability.

IT IS FINALLY ORDERED that the following claims will be submitted to a jury: Title 42 U.S.C. § 1983 – Denial of Medical Care; Title 42 U.S.C. § 1983 – Failure to Train or Supervise; Title 42 U.S.C. § 1983 – Unconstitutional Practice, Policy or Custom; and Mississippi State law claim for Denial of Medical Care.

SO ORDERED AND ADJUDGED this the 17th day of October, 2020.

s/ HENRY T. WINGATE
UNITED STATES DISTRICT COURT JUDGE