# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
July 15, 2022
Lyle W. Cayce
Clerk

No. 20-61061

Kyron La-Trell Williams, *a minor, by and through his mother and natural guardian*, Lavina Smith *individually and on behalf of all heirs at law and wrongful death beneficiaries of Marshawn Williams, deceased*; Donnie Williams,

*Plaintiffs—Appellees*,

Za'Riya Williams; Estate of Marshawn Williams,

*Intervenor Plaintiffs—Appellees*,

*versus*

City of Yazoo, Mississippi; Yazoo City Police Department; Andre Lloyd, *individually and in his official capacity*; Patrick Jaco, *individually and in his official capacity*; Chris Dean, *individually and in his official capacity*; Clifton Tilmon, *individually and in his official capacity*; Arthur Thompson, *individually and in his official capacity*; Officer Artis Harris, *individually and in his official capacity*; Officer Kenyon Banks, *individually and in his official capacity*; Sharon Vancleave, *individually and in his official capacity*; Tracy Langston, *individually and in his official capacity*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:15-CV-103

Before CLEMENT, GRAVES, and COSTA, *Circuit Judges*.
GREGG COSTA, *Circuit Judge*:

Marshawn Williams died in his cell at the Yazoo County Detention Center after bleeding internally for hours. His survivors allege that law enforcement officials knew that Williams had been assaulted with a metal pipe and that he was vulnerable to internal bleeding if injured, yet they ignored requests for help from Williams, his family, and his fellow detainees, and left Williams to suffer in his cell until it was too late. If these facts are proven at trial, the officials' indifference to Williams's serious medical needs violated his clearly established constitutional rights. We therefore affirm the denial of qualified immunity.

I

The parties dispute much of what happened in the hours leading up to Williams's death. The following account takes the facts in the light most favorable to Williams's survivors, as we must at summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).

On the evening of his death, Williams and his longtime girlfriend, Lavina Smith, got into a physical altercation at their Yazoo City, Mississippi home. A witness alerted both Smith's family and police.

Smith's family arrived first. Outraged that Williams had been violent to his sister, Smith's brother hit Williams on the side with either a bedrail or a metal pipe. The two men tussled over the object until Smith's uncle intervened and separated them.

Police were not far behind. Sergeant Thompson and Officers Harris, Dean, and Banks of the Yazoo City Police Department arrived at the home a few minutes later and split up: Harris and Thompson went inside to speak with Smith, while Dean and Banks spoke with Williams on the porch.

Williams told Dean and Banks that he had been drinking and that he and Smith had fought. He also told them that Smith's brother assaulted him

with a pipe. He lifted his shirt to show Dean where he had been hit, revealing superficial scratches. During that conversation, Williams laid down on the porch as if trying to sleep. Harris joined the group outside, handcuffed Williams, and informed him that he was under arrest for domestic violence.

Witnesses remember what happened next differently. Smith, who observed the arrest from the porch, recalls that Williams struggled to walk and collapsed on his way to the police car. The officers say that he was passively resisting arrest by forcing them to carry him to the vehicle. Harris sprayed mace in Williams's eyes and the officers loaded him into the police car.

The officers brought Williams to the Yazoo County Detention Center. Williams was in and out of consciousness during booking. At one point, he urinated on himself and slumped out of his chair to the ground. He did not cooperate with the officers' requests for personal information. Contrary to jail policy, no officer screened him for medical needs.

Dean and Banks escorted Williams to his cell. Again, Williams needed assistance walking. Three detainees overheard Williams ask Dean and Banks for help during the walk to his cell. One recalls Williams telling the officers, "I need my medical assistance, and I can't breathe," and another heard Williams say "I need some help. I need y'all to call my people, my family so I can get my medication." The third similarly remembers Williams requesting medical help. The officers did not respond to Williams's pleas.

Meanwhile, Officer Patrick Jaco called Smith to ask if Williams was sick or on any medication. Smith passed the phone to Williams's mother, Donnie, who said that she would come to the jail to discuss the matter. Donnie was worried because she knew that Williams had been in a scuffle back at the house and likely needed medical attention.

3

No. 20-61061

At the jail, Donnie, her daughter, and her nephew spoke to Harris, Jaco, Dean, Banks, and Officer Sharon VanCleave. Jailer Tracey Langston, who was sitting at a nearby desk, was also present for the conversation.[1]

Donnie told the group that Williams was not currently on any medication. She also told them that Williams "grabbed his side and fell over" before his arrest. She explained that Williams's blood does not clot normally so that "if he got hurt in any kind of way . . . he would just bleed." Williams's sister chimed in, noting that "[H]e could die!" Banks responded that Williams had passed out twice in front of them, but Dean dismissed his concerns, suggesting that Williams was merely being uncooperative to avoid arrest. The officials did not take any action in response to this information.

Once in his cell, Williams repeatedly called for his mother and for medical attention. He was unable to stand or use the toilet on his own. His cellmate propped him into a seated position against a wall, and he lost consciousness there.

For two to three hours, Williams's fellow detainees banged on their cell doors and repeatedly yelled to Langston that Williams was having a medical emergency. Langston asked them to quiet down and told them that she could not do anything until her superior returned to the jail. She did not check on the detainees hourly, as required by prison policy.

Around 2:15 a.m., officers found Williams dead in his cell. The autopsy report concluded that Williams had died of a laceration to his liver and extensive internal bleeding. It also noted blunt force injuries on the left side of his torso.

---

[1] The parties dispute whether Langston could hear what Donnie told the officers. At summary judgment, we credit Donnie's testimony that Langston was present the "whole time," which could support the conclusion that she heard this discussion.

No. 20-61061

Williams's surviving family sued Yazoo City, the Yazoo City Police Department, and the officers and jailer involved in his arrest and detention. They contend that the officials violated Williams's federal rights by falsely arresting him, using excessive force, and wrongfully denying him medical care. They further assert that the City violated his federal rights by inadequately training its employees and maintaining an unconstitutional policy of the same. Finally, they sued the officials in their official capacities for related state law torts, including an analogous denial-of-care claim.

The City and individual defendants moved for summary judgment. The district court dismissed many of the claims but determined that the federal and state denial-of-care claims and the claims against the City should be submitted to a jury. In rejecting the officials' qualified immunity defense at summary judgment, the district court found numerous fact issues that, if resolved in the plaintiffs' favor, would establish their liability on the federal denial-of-care claim. It did not, however, consider whether that constitutional violation was clearly established at the time of Williams's death.

Believing that the entire suit should have been dismissed, the defendants appealed.

II

Many defendants would like to appeal, but only some may. "Ordinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291." *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999). But under the collateral order exception to the final judgment rule, we may hear interlocutory appeals of the "small category of decisions that, although they do not end the litigation, must nonetheless be considered final" because they would be effectively unreviewable on appeal from final judgment. *Swint v.*

5

*Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (internal quotation omitted). Because qualified immunity insulates officials from the burdens of litigation, a benefit that is irretrievably lost if the official prevails at trial, denials of immunity fall into that narrow category. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). That is why we can review the federal denial-of-medical care claim against the officials in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991).

Yazoo City's appeal is different. Municipalities do not enjoy qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 638 & n.18 (1980), so the denial of summary judgment to the City is not an immediately appealable collateral order, *see Swint*, 514 U.S. at 43. Lacking a final order, we have no jurisdiction over the *Monell* claims.

Yazoo City argues that we nonetheless can hear its appeal because it is "inextricably intertwined" with the claims against the individual defendants. But we do not allow municipalities to piggyback on officers' interlocutory qualified immunity appeals. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407 (5th Cir. 2007) ("[R]efus[ing] to recognize 'so strange an animal as pendent party interlocutory appellate jurisdiction.'" (quoting *McKee v. City of Rockwell*, 877 F.2d 409, 413 (5th Cir. 1989))); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 477–78 (5th Cir. 1999) (rejecting pendent jurisdiction over *Monell* claim in qualified immunity appeal); *see also* Bryan Lammon, *Municipal Piggybacking in Qualified-Immunity Appeals*, 126 Pa. St. L. Rev. 123, 137, 141 (2021) (explaining that while some circuits allow municipal piggybacking, the Fifth Circuit does not). In other words, our pendent jurisdiction does not allow us to bring additional parties into an appeal, even if their claims relate to an issue that is properly before us. Yazoo City must wait for final judgment to appeal the inadequate training and unconstitutional policy claims.

No. 20-61061

We lack jurisdiction over the state law denial-of-medical-care claim for the same reasons. Although the claim is nominally against the individual defendants, they are sued only in their "representative" capacity. *See* Miss. Code Ann. § 11–46–7(2).[2] Like federal law, Mississippi law treats official-capacity officer suits as suits against the employing government entity. *Womble v. Singing River Hosp.*, 618 So.2d 1252, 1261 (Miss. 1993) ("[S]uing public officials in their official capacities is tantamount to suing the State or its affiliated entities themselves."); *Mallery v. Taylor*, 805 So.2d 613, 622 (Miss. 2002) ("Unless the action is brought solely against an employee acting outside of the scope of his employment, the government entity must be named and sued as the party in interest under the Tort Claims Act."); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal citation omitted). Yazoo City does not enjoy qualified immunity and thus has no right to interlocutory appeal.

Accordingly, at this time we consider only the individual defendants'[3] qualified immunity appeal.

### III

Qualified immunity protects officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the immunity defense, Williams's survivors must show both (1) that the officials violated Williams's statutory

---

[2] Mississippi officers can be personally liable for torts committed beyond the scope of their employment, *see* Miss. Code Ann. § 11–46–7(2), but that is not alleged here.

[3] For the remainder of the opinion, "defendants" will refer to these individual defendants, as they are the only ones whose appeal we can consider.

7

or constitutional right and (2) that right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Although we may review qualified immunity denials on interlocutory appeal, our review is more limited than our usual summary judgment practice. We do not decide whether genuine fact disputes exist. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Instead, accepting the plaintiffs' version of the facts, we consider only the legal question whether the defendants' actions were objectively unreasonable in light of clearly established law. *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

A

The Constitution imposes a duty on the state to provide for the safety and wellbeing of the people it incarcerates. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). For people already convicted of a crime, this duty stems from the Eighth Amendment's prohibition on cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). For those like Williams, who have not yet faced trial, it stems from due process instead. *See Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979). The state's obligation is the same in both contexts:[4] It must provide for

---

[4] The Supreme Court recognizes that pretrial detainees' right to medical care is "at least as great" as that of convicted prisoners, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), but has never defined the contours of that right, *see City of Canton v. Harris*, 489 U.S. 378, 388 n.8 (1989) (leaving the question open). We are in the "slight majority" of circuits that apply the Eighth Amendment standard equally to denial-of-care claims by pre- and post-trial detainees. David C. Gorlin, Note, *Evaluating Punishment in Purgatory: The Need to Separate Pretrial Detainees' Conditions-of-Confinement Claims from Inadequate Eighth Amendment Analysis*, 108 MICH. L. REV. 417, 426 & 428 n.71 (2009); *see also* Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. PA. L. REV. 1009, 1024 (2013) (observing a trend toward this approach). The minority approach grants pretrial detainees broader protections because they have not yet been found guilty. Gorlin, *supra*, at 426 n.54, 427–28; *see also Bell*, 441 U.S. at 535 (explaining that pretrial detainees cannot be held in punitive conditions).

8

detainees' "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200; *see also Hare v. City of Corinth ("Hare II")*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (extending this standard to the pretrial detention context).

The Fourteenth Amendment thus bars law enforcement from responding to a detainee's serious medical needs with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Hare II*, 74 F.3d at 647–48. To prove deliberate indifference, Williams's survivors must show that the defendants knew that he faced a substantial risk of serious harm and failed to take reasonable measures to abate that risk. *Farmer*, 511 U.S. at 847. The knowledge inquiry is subjective. We ask what the officials knew, not what they "should have perceived but did not." *Id.* at 838.[5] But the reasonableness question is objective: It turns on whether the officials' response to a known risk was reasonable as a matter of law. *Hare v. City of Corinth ("Hare III")*, 135 F.3d 320, 327–28 (5th Cir. 1998). We consider each defendant's knowledge and response individually. *See Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015).

Taking Williams's allegations as true, Dean and Banks were aware of a substantial risk to Williams's health. Williams's family was so concerned about him that they came to the station to tell law enforcement about his medical vulnerability. Williams's mother informed them that Williams

---

[5] The defendants assert that the risk to the detainee must be "obvious." It is true that "[w]e have found deliberate indifference when the plaintiff alleges facts of an apparent or obvious risk to a prisoner's health." *Estate of Cheney v. Collier*, 560 F. App'x 271, 273–74 (5th Cir. 2014) (unpublished). But this is just one way of proving that an official had actual awareness of a serious medical need. *See Farmer*, 511 U.S. at 842 ("[K]nowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"). If an official has subjective knowledge of a risk, it does not matter whether that risk would be obvious to anyone else.

suffered from a preexisting and life-threatening blood clotting condition that would cause him to bleed internally if he was "hurt in any kind of way." And Williams's sister reiterated to them how serious the condition was, explaining that Williams "could die" if injured.

In addition to knowing of Williams's diagnosis, Dean and Banks knew that Williams was hurt. When they first talked to Williams, he told them that he had been hit in the side with a metal pipe. Williams's mother later reminded them that he "grabbed his side and fell over" before his arrest. Dean and Banks also witnessed Williams struggling to walk and were aware that he passed out at least twice during his arrest and booking. If any doubt remained about Williams's need for care at that point, it was eliminated when Williams told Dean and Banks that he could not breathe and asked them for medical assistance while they escorted him to his cell. *Contrast Pearson v. Prison Health Serv.*, 850 F.3d 526, 540 (3d Cir. 2017) (concluding that officer had no knowledge of risk because plaintiffs did not present any evidence "that the seriousness of [the detainee's] bleeding was communicated to her").

If these allegations are proven, this is not a close case: Williams's diagnosis, symptoms, and requests for help notified Dean and Banks of a significant risk that he was bleeding internally. *See Easter v. Powell*, 467 F.3d 459, 463–65 (5th Cir. 2006) (finding knowledge of risk based on combination of known heart condition, complaints of chest pain, and request for medication); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (finding knowledge based on recent broken jaw diagnosis, complaints of pain, and requests for treatment).

The evidence construed in plaintiffs' favor would also allow a jury to find that Harris, Jaco, and VanCleave knew of Williams's serious medical situation. Like Dean and Banks, they were informed by Williams's family

that he had a blood clotting condition that made any injury potentially fatal. They also saw Williams lose consciousness during booking. Unlike Dean and Banks, they did not know exactly how Williams had been injured—they only knew from his mother that he "grabbed his side and fell over." Although they did not know the full severity of Williams's injuries, a jury could find that the risk was obvious. *See Farmer*, 511 U.S. at 842. Falling over can indicate a serious condition, particularly given Williams's symptoms, his family's grave concerns, and the officers' knowledge that "any kind" of injury could kill him. A jury could conclude that the officers put the clues together and were aware that Williams might be harmed. *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996) (inferring that law enforcement knew of risk from combination of potential trauma, complaints of pain, and abrasions); *see also Hare III*, 135 F.3d at 322–23, 325 (determining that law enforcement could infer suicide risk from threats of self-harm and family's concern).

Observing Williams's behavior alone may not have been enough to establish the defendants' knowledge. We have granted qualified immunity when law enforcement misconstrued the symptoms of a serious medical condition for intoxication, *see, e.g.*, *Roberts v. Lessard*, 841 F. App'x 691, 694 (5th Cir. 2021) (unpublished), or a less serious illness, *Estate of Cheney v. Collier*, 560 F. App'x 271, 274–75 (5th Cir. 2014) (unpublished). But in those cases, the officials had to assess the risk to the detainee's health based on symptoms alone. We afford law enforcement latitude in those situations recognizing that they do not have the training of a medical professional. *See Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990).

Here, however, the officers' knowledge of risk was based on much more than just symptoms: They also knew that Williams had a life-threatening condition and had suffered trauma of the type that would trigger that condition. Those additional factors distinguish this case from the

symptoms-only scenarios in *Roberts* and *Cheney*. *Cf. Easter*, 467 F.3d at 463–64 (symptoms and diagnosis); *Hegmann*, 198 F.3d at 159–60 (same). Considering all the facts together, a reasonable jury could find that Dean, Banks, Harris, Jaco, and VanCleave all knew of a high risk that Williams was bleeding internally.

Knowledge of risk, of course, is not enough for liability. Williams's survivors must also show that the officials failed to take reasonable measures to abate that risk. *See Farmer*, 511 U.S. at 847. Again, they met their summary judgment burden. We have repeatedly held that refusing to treat a detainee and ignoring a detainee's complaints are unreasonable responses to a known medical risk. *See, e.g.*, *Perniciaro v. Lea*, 901 F.3d 241, 258 (5th Cir. 2018) (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)); *see also Nerren*, 86 F.3d at 473 (finding deliberate indifference because officers "turned a deaf ear" to an inmate's requests for medical attention). Yet that is exactly what the defendants did. Despite knowing of Williams's injury and condition, they ignored his requests for help. In fact, they did not do anything to make sure that he was okay. They did not question him about his medical condition, move him to an observational cell, summon medical assistance, or even check on him in the hours following his arrest. Ignoring Williams's requests for help and refusing to treat him were unreasonable responses to the known risk to his life. *See Easter*, 467 F.3d at 465 (concluding that "offer[ing] no treatment options to a patient with a history of cardiac problems who was experiencing severe chest pains" was unreasonable).

The defendants believe that their response was reasonable because Dean examined Williams's abdomen prior to his arrest and Jaco called Williams's family to ask about his medical needs. The problem is that both actions occurred before their conversation with Williams's family. At that point, only Dean and Banks knew that Williams had been hit with the pipe and none of the defendants knew about his clotting disorder. They also had

not yet observed him struggling to walk and passing out during booking. Once they learned of the combination of Williams's preexisting condition and his trauma, they knew of the risk to his life and were obligated to take reasonable action to abate that risk.

Langston also had knowledge of, yet ignored, the risk to Williams's life. The plaintiffs allege that she too heard Williams's family tell the officers about his clotting condition. But her involvement does not end there. On the night Williams died, Langston was charged with checking on the detainees hourly and providing them food and water. Williams's fellow detainees say that after he was brought to his cell in bad condition, they tried to get Langston's attention by beating on their cell doors for two to three hours and repeatedly yelling things like "Help!" and "We have an emergency! We need medical attention! We need a doctor!" A jury could find that Langston heard these cries for help, in which case she certainly was aware of the risk that Williams was experiencing a medical emergency. *See Hegmann*, 198 F.3d at 159–60 (finding deliberate indifference because officials ignored "urgent and repeated requests for immediate medical treatment"). Like the other defendants, Langston did not do anything to make sure that Williams was okay. According to the detainees, she did not investigate their concerns, call for medical help, or even perform the hourly checks required by prison policy. Instead, they allege, Langston's only response to their cries was telling them to stop beating on their doors. Such a total failure to act was unreasonable. *See Nerren*, 86 F.3d at 473.

Defendants emphasize that deliberate indifference is not a "should have known" standard; it requires actual knowledge of the serious medical risk. But as we have chronicled, this is a case of direct knowledge. Numerous sources—Williams, his family, and his fellow detainees—told law enforcement that Williams needed medical attention for his life-threatening blood clotting disorder. Their warnings fell on deaf ears. The defendants

13

ignored their requests for help, leaving Williams to bleed to death in his cell. If proven at trial, this indifference to Williams's known, urgent medical needs violated due process.

B

The defendants' knowledge of Williams's condition also means that the unlawfulness of their conduct was clearly established. To defeat the immunity defense, Williams's survivors must show that his constitutional rights were clearly established at the time of the violation.[6] *al-Kidd*, 563 U.S. at 735. A right is clearly established if reasonable officials have notice that their actions are unlawful. *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc). Caselaw must place the constitutional question "beyond debate," though it need not be "directly on point." *al-Kidd*, 563 U.S. at 741.

Officers and jailers have long had notice that they cannot ignore a detainee's serious medical needs. It is clearly established that an official who refuses to treat or ignores the complaints of a detainee violates their rights. *Sims v. Griffin*, 35 F.4th 945, 951–52 (5th Cir. 2022) (citing *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)). We are mindful that we must not define clearly established law "at too high a level of generality," *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021), but we have seen cases like this before.

---

[6] The district court denied the defendants qualified immunity but did not address whether the law was clearly established. But because the clearly established issue is a purely legal question subject to our *de novo* review, we may address it now in the interest of judicial economy rather than remanding. *See Mitchell*, 472 U.S. at 530 (finding immunity question "appropriate for our immediate resolution" even though it was not addressed below (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 743 n.23 (1982))). Addressing it now is the much more efficient course in this long-pending case as any ruling by the district court on remand would generate another appeal.

Case: 20-61061   Document: 00516443010   Page: 15   Date Filed: 08/23/2022
Case: 3:15-cv-001   Document: 105   Document 14   Filed 08/23/22   Page 35 of 2022

No. 20-61061

We begin with *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) (per curiam). We denied qualified immunity to prison officials who knew that Easter had a preexisting, serious heart problem but refused him treatment when he presented with severe chest pain. *Easter*, 467 F.3d at 463-64. The same elements exist here: The defendants knew that Williams had a life-threatening preexisting condition and that his condition was potentially triggered, yet they "turned a deaf ear to his request for medical treatment." *See id*. at 464. *Easter* thus establishes these defendants' deliberate indifference to Williams's known condition.

*Nerren v. Livingston Police Department*, 86 F.3d 469 (5th Cir. 1996), is similar. There, we denied qualified immunity to officers who rejected Nerren's request for medical assistance despite knowing that he was involved in a car accident. *Nerren*, 86 F.3d at 470-71. The reasons for our decision are familiar. Again, we noted the officers' knowledge of a potentially harmful circumstance and their "deaf ear" to the detainee's request for care. *Id*. at 473. *Contrast Williams v. Zachary*, No. 21-60753, 2022 WL 2101518, at *4 (5th Cir. June 10, 2022) (distinguishing *Nerren* because officers did not know that detainee "had recently undergone significant trauma" and detainee did not ask the officers for medical care).

The facts of this case fit comfortably within *Easter*'s and *Nerren*'s teaching that law enforcement may not ignore reports that a detainee is suffering a serious medical emergency, particularly when those reports are backed by knowledge of a preexisting condition or trauma. Here, the reports came from numerous sources: Williams, his family, and his fellow detainees. At the time of Williams's death, it was beyond debate that the defendants' total failure to respond to his medical needs was unconstitutional.

We do not know whether a jury will agree with Williams's survivors' and fellow detainees' account of what happened the night of his death. But

if they do, the defendants violated clearly established law by responding to Williams's serious medical need with deliberate indifference. The district court correctly held that the federal denial-of-care claim can proceed to trial.

\*\*\*

We DISMISS Yazoo City's appeals for lack of jurisdiction, AFFIRM the district court's denial of qualified immunity to the individual defendants on the federal denial-of-medical-care claim, and REMAND for further proceedings.